UNITED STATES of America,
Plaintiff,

v.

PHILIP MORRIS INCORPORATED,
et al., Defendants.

No. CIV.A.99–2496 GK.

United States District Court,
District of Columbia.

Sept. 28, 2000.

J. Patrick Glynn, Sharon Y. Eubanks, Department of Justice Civil Division/Torts Branch, Washington, DC, David W. Ogden, Acting Asst. Atty. Gen., William Schultz, Thomas J. Perrelli, Deputy Asst. Attys. Gen., Frank J. Marine, Sr. Litigation Counsel, Patrice M. Mulkern, U.S. Dept. of Justice, Washington, DC, Mark B. Stern, J.P. Ellison, Douglas Hallward–Driemeier, Robert Loeb, Dana J. Martin, Collette G. Matzzie, Mary Jo Moltzen, Peter J. Smith, Elizabeth A. Welsh, Attys., Civ. Div., Washington, DC, for Plaintiff.

Timothy M. Broas, Robert M. Rader, Winston & Strawn, Washington, DC, Dan K. Webb, Winston & Strawn, Chicago, IL, Herbert M. Wachtell, Ben M. Germana, Winston & Strawn, Washington, DC, Steven M. Barna, Jeffrey M. Wintner, Wachtell, Lipton, Rosen & Katz, New York City, Robert Francis McDermott, Jr., Jones, Day, Reavis & Pogue, Washington, DC, Robert C. Weber, Paul Christ, Jones, Day, Reavis & Pogue, Cleveland, OH, Jonathan, M. Redgrave, Gray, Plant, Mooty, Mooty & Bennett, PA, Minneapolis, MN, David M. Bernick, Kirkland & Ellis, Chicago, IL, Kenneth N. Bass, Kirkland & Ellis, Washington, DC, Stephen R. Patton, Kirkland & Ellis, Chicago, IL, Michael B. Minton, Thompson Coburn, LLP, Washington, DC, J. William Newbold, Coburn & Croft, St. Louis, MO, Richard Paul Cassetta, Thompson & Coburn, LLP, St. Louis, MO, Warren Neil Eggleston, Michael P.A. Cohen, Howrey, Simon, Arnold & White, Washington, DC, Kenneth Anthony Gallo, Fred W. Reinke, Clifford, Chance, Rogers & Wells, LLP, Washington, DC, Aaron H. Marks, Marc E. Kasowitz, Daniel R. Benson, Kasowitz, Benson, Torres, Friedman L.L.P., New York City, Michael Asher Schlanger, Sonnenschein, Nath & Rosenthal, Washington, DC, Mary Elizabeth

McGarry, Simpson, Thacher & Bartlett, New York City, Michael V. Corrigan, Simpson Thacher & Bartlett, New York City, Demetra Frawley, Simpson Thacher & Bartlett, New York City, William Salvatore D'Amico, Chadbourne & Parke, Washington, DC, Timothy M. Hughes, Garyowen P. Morrisroe, Chadbourne & Parke, New York City, Bruce G. Merrit, Steven S. Michaels, Debevoise & Plimpton, New York City, Judah Best, Debevoise & Plimpton, Washington, DC, John Vanderstar, Keith Allen Teel, Covington & Burling, Washington, DC, for Defendants.

## MEMORANDUM OPINION

KESSLER, District Judge.

### I. Introduction

Plaintiff, the United States of America ("the Government"), brings suit against eleven tobacco-related entities ("Defendants")[1] to recover health care expenditures the Government has paid for or will pay for to treat tobacco-related illnesses allegedly caused by Defendants' tortious conduct. The Government also asks this Court to enjoin Defendants from engaging in fraudulent and other unlawful conduct and to order Defendants to disgorge the proceeds of their past unlawful activity.

The Government makes four claims against Defendants under three statutes. The first statute, the Medical Care Recovery Act ("MCRA"), 42 U.S.C. §§ 2651–2653, provides the Government with a cause of action to recover certain specified health care costs it pays to treat individuals injured by a third-party's tortious conduct (Count 1). The second statute is a series of amendments referred to as the Medicare Secondary Payer provisions ("MSP"), 42 U.S.C. § 1395y, which provides the Government with a cause of action to recover Medicare expenditures when a third-party caused an injury requiring treatment and a "primary payer" was obligated to pay for the treatment (Count 2). The third statute is the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968 (Counts 3 and 4), which provides parties with a cause of action to recover treble damages due to injuries they received from a defendant's unlawful racketeering activity, and to seek other equitable remedies to prevent future unlawful acts.

This matter is now before the Court on Defendants' motions to dismiss for failure to state a claim.[2] Upon consideration of the motions, oppositions, replies, the applicable case law, the arguments presented at the motions hearing, and the entire record herein, for the reasons discussed below, the Non–Liggett Defendants' motion to dismiss for failure to state a claim [# 72] is **granted** as to the MCRA claim (Count 1), **granted** as to the MSP claim (Count 2), and **denied** as to the RICO claims (Counts 3 and 4). Liggett's separate motion to dismiss for failure to state a claim [# 70] is **denied.**

### Summary of Legal Conclusions

The United States Government has brought this massive civil action against the tobacco industry, seeking billions of dollars in damages for what it alleges to be a lengthy unlawful conspiracy to deceive the American public about the health effects of smoking and the addictiveness of nicotine. In order to prevail on these allegations, the Government has offered three distinct legal theories of liability. Two of these theories are being rejected, and therefore, Counts 1 and 2 of the Complaint will be dismissed. A significant portion of the Government's case, however, will go forward, namely its claims under RICO for disgorgement of all profits Defendants derived from activities, beginning in 1953 and

---

1. The eleven Defendants are: Philip Morris, Inc. ("Philip Morris"), R.J. Reynolds Tobacco Co. ("R.J.Reynolds"), Brown & Williamson Tobacco Co. ("Brown & Williamson"), Lorillard Tobacco Company ("Lorillard"), The Liggett Group, Inc. ("Liggett"), American Tobacco Co. ("American Tobacco"), Philip Morris Cos., B.A.T. Industries p.l.c. ("BAT Ind."), British American Tobacco (Investments) Ltd., The Council for Tobacco Research—U.S.A., Inc. ("CTR"), and The Tobacco Institute, Inc. ("TI"). The latter two entities do not manufacture or sell tobacco products, but are alleged to be co-conspirators in Defendants' tortious activities.

2. Defendant BAT Ind.'s motion to dismiss for lack of personal jurisdiction is addressed in a separate Memorandum Opinion issued the same day as this Opinion.

continuing to the present, related to the alleged pattern of racketeering activity. Consequently, Counts 3 and 4 of the Complaint will proceed. In sum, while the Government's theories of liability have been limited, the extent of Defendants' potential liability remains, in the estimation of both parties, in the billions of dollars. The scope and complexity of this case will continue to pose significant challenges to the parties and to the Court.

1. The Government's Medical Care Recovery Act claim will be dismissed. The congressional intent in enacting MCRA in 1962—at which time Medicare did not exist and the Federal Employees Health Benefits Act ("FEHBA")[3] was still in its infancy—was to provide a means for the Government to recover from third-party tortfeasors[4] medical expenses it had furnished for (primarily military) employees. Applying the principles from a recent U.S. Supreme Court decision, *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000), this Court concludes that Congress did not intend that MCRA be used as a mechanism to recover Medicare or FEHBA costs. The Court reaches this conclusion after examining the broad context in which MCRA has existed for 38 years—including its legislative history, the construction given it by those agencies charged with its interpretation, a body of long-standing state and federal case law, and its total non-enforcement by the Department of Justice for thirty-seven of those thirty-eight years.

2. The Government's Medicare Secondary Payer claim will also be dismissed. MSP permits the Government to seek reimbursement from insurance entities, when Medicare has paid for health care expenses for which those entities should have paid. Although MSP also allows the Government to bring suit against non-in-surance entities required to pay for health care costs under a "self-insured plan," the Government's Complaint contains no allegation that Defendants have at any time maintained a "self-insured plan," as that term is defined by MSP and the relevant regulations. Further, it is clear that Congress did not intend MSP to be used as an across-the-board procedural vehicle for suing tortfeasors, which is precisely how the Government attempts to use the statute in this case.

3. The Government's Racketeer Influenced and Corrupt Organization Act claims will be permitted to go forward. The Government has adequately alleged, which is all it must do at this early stage in the litigation, the necessary elements of a RICO claim: that Defendants formed an "enterprise" which engaged in the requisite "pattern of racketeering activity." In addition, given the nature and scope of Defendants' alleged prior misconduct, the Government has adequately pleaded its basis for requesting injunctive relief, including the specific remedy of disgorgement.[5]

## II. *Standard of Review*

A "complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *see also Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 654, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999). At the motion to dismiss stage, "the only relevant factual allegations are the plaintiffs'," and they must be presumed to be true. *Ramirez de Arellano v. Weinberger*, 745 F.2d 1500, 1506 (D.C.Cir.1984), *vacated on other grounds*, 471 U.S. 1113, 105 S.Ct. 2353, 86 L.Ed.2d 255 (1985); *Shear v. National Rifle Ass'n of Am.*, 606 F.2d 1251, 1253 (D.C.Cir.1979). Despite the sweeping breadth and seriousness of the Government's allegations, their validity is not for this Court to judge at this time.

**3.** FEHBA is codified at 5 U.S.C. § 8901 *et seq.*

**4.** A "tortfeasor" is an individual or entity that commits a civil wrong for which a remedy, usually monetary damages, may be obtained. *See* Black's Law Dictionary (7th ed.1999).

**5.** "Disgorgement" is defined as the "act of giving up something (such as profits illegally obtained) on demand or by legal compulsion." *See* Black's Law Dictionary (7th ed.1999).

### III. *Statement of Facts*

The Government's Complaint describes in detail what it alleges to be a four-decade long conspiracy, dating from at least 1953, to intentionally and willfully deceive and mislead the American public about, among other things, the harmful nature of tobacco products, the addictive nature of nicotine, and the possibility of manufacturing safer and less addictive tobacco products. Complaint ("Compl.") at ¶ 3. Defendants' conspiratorial activity includes making numerous "false and deceptive" statements and concealing documents and research in an attempt to cover-up their deceit. Compl. at ¶ 5. According to the Government, Defendants continue to "prosper and profit" from their actions and will continue to do so into the future, unless restrained by this Court. Compl. at ¶ 6. The specifics of the alleged conspiracy are described below.

"In the 1940's and early 1950's, scientific researchers published findings that indicated a relationship between cigarette smoking and diseases, including lung cancer." Compl. at ¶ 30. Tobacco companies "closely monitored" this research, conscious that if the public became aware of these findings, the companies' profits would likely decline and they would "face the prospect of civil liability and government regulation." Compl. at ¶ 31. To combat these possibilities, the chief executives of Defendants American Tobacco, Brown & Williamson, Lorillard, Philip Morris, and R.J. Reynolds met in late 1953 in New York City, where they devised a concerted strategy to preserve and expand the market for, and profits from, cigarettes. Compl. at ¶ 32.

According to the Government, the underlying strategy Defendants adopted was simple: to deny that smoking caused disease and to consistently maintain that whether smoking caused disease was an "open question." Compl. at ¶ 34. To maintain and further this strategy, Defendants issued deceptive press releases, published false and misleading articles, destroyed and concealed documents which indicated that there was in fact a correlation between smoking and disease, and aggressively targeted children as potential new smokers. Compl. at ¶ 36.

One of the first major steps Defendants took was to announce the formation of an entity initially known as the Tobacco Industry Research Committee ("TIRC") and which later became known as the Council for Tobacco Research ("CTR" or "Council").[6] This entity, which Defendants publicized widely as an objective research body, published in January 1954 a full-page statement that ran in 448 newspapers throughout the United States. Titled "A Frank Statement to Cigarette Smokers," the statement asserted that, according to "distinguished authorities," "there is no proof that cigarette smoking is one of the causes" of lung cancer. Compl. at ¶ 37. Defendants further stated: "We believe the products we make are not injurious to health"—even though Defendants' own employees had by this time "identified the carcinogenic substances in tobacco smoke." Compl. at ¶¶ 37, 38. Promising to aid and assist research into all phases of tobacco use and health and to provide complete information to the public, the publication stated that the newly formed Council would perform independent, objective, and reliable research about the allegations against smoking. Compl. at ¶ 37.[7]

According to the Government, CTR was not independent, objective or reliable. Its purpose was not to research issues of concern to the public, but rather to serve as a "front" or "cover" for Defendants' conspiracy to conceal the truth about smoking's health risks. Compl. at ¶ 60. Defendants

---

6. According to the Government, Defendant Liggett did not join the Council until 1964. Compl. at ¶ 41.

7. Defendants also established a Scientific Advisory Board ("SAB"), which they claimed was an independent research arm of the CTR. Compl. at ¶ 61. The Government disputes this, alleging that the SAB was "closely controlled" by Defendants to prevent it from approving research that suggested any link between smoking and disease. Compl. at ¶ 62.

used CTR to fund "Special Projects" that were devised to counter evidence of smoking's adverse health effects by providing alternative explanations for tobacco-related diseases. Compl. at ¶ 65.

The Government alleges that these projects were designed largely to generate research data and witnesses for use in defending lawsuits and opposing tobacco regulation, rather than to ascertain or improve the safety of Defendants' products. To accomplish this objective, Defendants put attorneys in control of the Council's research and devised strategies to withhold from civil discovery critical information about the health effects of cigarette smoking by improperly invoking the attorney-client privilege and work-product doctrine. *Id.* If CTR research ever "threatened to confirm the link between smoking and disease," Defendants exerted pressure on the scientists conducting the research, so as to alter the results, terminate the research, and/or conceal the findings. Compl. at ¶ 67.

In 1958, Defendants created another entity, the Tobacco Institute ("TI"), a "public relations organization" whose function was to keep the public, the medical establishment, the media and the government in the dark about tobacco's health risks, especially the "connection between smoking and disease." Compl. at ¶ 42.

Defendants also entered into what they termed a "gentleman's agreement" not to perform in-house research on smoking, health, or the development of "safe" cigarettes. Compl. at ¶ 45. Each Defendant enforced this agreement—a central tenet of the conspiracy—by obstructing research efforts by any other company. Even when individual companies performed limited in-house research, the fundamental understanding remained intact: information that would tend to establish the harm caused by cigarette smoking would be suppressed and concealed. Compl. at ¶ 48.

The Government alleges that over the course of the conspiracy, Defendants have made numerous misstatements concerning one item in particular: nicotine. Defendants continually denied that nicotine is addictive, even in the face of overwhelming evidence to the contrary. Compl. at ¶¶ 71–72. For example, Defendant Brown & Williamson acknowledged internally in 1963 that "we are . . . in the business of selling nicotine, an addictive drug." Comp. at ¶ 72. Researchers hired by Philip Morris in the 1980's concluded that "in terms of addictiveness, 'nicotine looked like heroin'." Compl. at ¶ 73. Instead of making these results public, however, Defendant Philip Morris threatened the researchers with legal action, killed the lab animals, removed the lab equipment and closed the lab down entirely. *Id.*

And in 1963, Defendant Brown & Williamson deliberately withheld from the Surgeon General research on the addictiveness of nicotine. Compl. at ¶ 74. When the Surgeon General finally concluded, based on independent research, that nicotine is in fact addictive, TI attacked and criticized the report as "an unproven attempt to find some way to differentiate smoking from other behaviors." *Id.* Defendants have engaged in these and numerous other acts of deception because they recognize that "getting smokers addicted to nicotine is what preserves the market for cigarettes and ensures their profits." Compl. at ¶ 71.

Not only have Defendants denied the addictive powers of nicotine, but it is alleged that they have also taken non-public actions to increase its potency and make cigarettes even more addictive. Despite having used "highly sophisticated technologies," including the selective breeding and cultivation of tobacco plants, to manipulate and increase the potency of nicotine in their cigarettes, Compl. at ¶ 77, Defendants have repeatedly denied that they manipulated the level of nicotine in their products. Compl. at ¶ 79. A 1994 R.J. Reynolds advertisement, for example, states: "We do not increase the level of nicotine in any of our products in order to addict smokers." Compl. at ¶ 81. Defendants also marketed "light" or "low tar/low

nicotine" cigarettes as being less hazardous to smokers, Compl. at ¶ 86, even though individuals who smoke such cigarettes are "not appreciably reducing their health risk." Compl. at ¶ 88.

The Government also alleges that Defendants suppressed research regarding less hazardous cigarettes. Phillip Morris, for example, conducted research which concluded that a "medically acceptable low-carcinogen cigarette may be possible," but this finding was never released to the public. Compl. at ¶ 105. Indeed, Defendants have refused to acknowledge the possibility of such a cigarette. Compl. at ¶¶ 108, 109.

The Government charges that Defendants have "aggressively targeted their campaigns to children." Compl. at ¶ 96. R.J. Reynolds' Joe Camel campaign is just one of the most well-known examples of such tactics. Compl. at ¶ 97. Defendants have advertised in stores near high schools, promoted brands heavily during spring and summer breaks, given away cigarettes at places where young persons congregate, paid for product placement in movies with youth audiences, placed advertisements in magazines with high youth readership, and sponsored sporting events, rock concerts, and other events of interest to children. Compl. at ¶ 96. Defendants have consistently made false and misleading statements that their expenditures on advertising and marketing were directed exclusively at convincing current smokers to switch brands, not at enticing children. Compl. at ¶ 100.

The Government maintains that all the above misstatements, and fraudulent and conspiratorial activity are ongoing. Although Defendants have now admitted that there is "a substantial body of evidence which supports the judgment that cigarette smoking plays a causal role in the development of lung cancer and other diseases in smokers," Compl. at ¶ 116, and

have conceded that cigarettes are "addictive," as that term is used by the public at large. Compl. at ¶ 120, Defendants still market their products in deceptive and unlawful ways; they conceal documents relating to the health effects of cigarettes, nicotine and the true nature of CTR; and they continue to pose a threat "to the health and well-being of the American public." Compl. at ¶ 124.

The Government alleges that the harm caused by the Defendants' decades-long conspiracy has compelled numerous entities, including the government, to expend immense resources to treat, alleviate and minimize the resulting disease and devastation. Compl. at ¶ 6. In this action, the Government seeks to recover some or all of the "$20 billion annually" it has spent to treat the "injuries and diseases caused by defendants' products." Compl. at ¶ 5. It also seeks various forms of equitable relief, including the disgorgement of Defendants' profits, to deter Defendants and others from engaging in similar conduct in the future.

## IV. *Defendants' Motion To Dismiss* [8]

### A. The Government's Medical Care Recovery Act Claim

In 1962, Congress enacted the Medical Care Recovery Act ("MCRA"), which provides in pertinent part:

In any case in which the United States is authorized or required by law to furnish [or pay for] [9] hospital, medical, surgical, or dental care and treatment ... to a person who is injured or suffers a disease, ... under circumstances creating a tort liability upon some third person ... to pay damages therefore, the United States shall have a right to recover (independent of the rights of the injured or diseased person) from said third person, or that person's insurer,

---

8. Section IV specifically addresses arguments raised by the Non–Liggett Defendants but applies equally to Liggett, which has joined in this Motion.

9. The bracketed language was added by a 1996 amendment. *See* Pub.L. No. 104–201, § 1075, 110 Stat. 2442, 2663 (1996).

the reasonable value of the care and treatment so furnished, to be furnished, paid for, or to be paid for and shall, as to this right be subrogated to any right or claim that the injured or diseased person ... has against such third person ...

42 U.S.C. § 2651(a), Pub.L. No. 87–693, § 1, 76 Stat. 593 (1962).

At first blush, MCRA's language might seem quite clear. The statute generally provides the Government with a means to recover from tortfeasors the health care costs it has expended on behalf of victims of tortious conduct. If the Government has "paid for" or "furnished" such care, it may seek reimbursement from the individual or entity that caused the injury. The statute is broadly worded: Congress could have restricted the Government's ability to obtain reimbursement in any number of ways, both substantively and procedurally, but it did not.

However, the specific question before this Court—and it is a difficult one the resolution of which has enormous ramifications—is whether MCRA, a statute enacted in 1962 and amended in a minor fashion in 1996, covers, or was intended by Congress to cover, payments made by the United States Government under Medicare and the Federal Employees Health Benefits Act ("FEHBA") [10] to treat tobacco-related illnesses allegedly caused by Defendants' tortious conduct.

■ Only a few months ago, the Supreme Court grappled with an equally difficult issue of statutory interpretation in *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000), a case in which it had to decide whether the Food and Drug Administration possessed authority to regulate tobacco products as customarily marketed. While this Court fully recognizes that the present case, unlike *Brown & Williamson,* does not involve "an administrative agency's construction of a statute," thereby triggering the two-step *Chevron* analysis,[11] 120 S.Ct. at 1300 (citing *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)), the general analytical approach followed in *Brown & Williamson* as it relates to statutory construction and congressional intent is nevertheless instructive and illuminating. Like the Supreme Court in *Brown & Williamson,* this Court's obligation is to ascertain congressional intent by viewing a particular statute in the context of relevant congressional action taken during and subsequent to its enactment. Accordingly, there are significant principles articulated by the *Brown & Williamson* Court that speak to how the instant case should be resolved.

■ One such principle is that subsequent legislative action may shed light on congressional intent. "At the time a statute is enacted, it may have a range of plausible meanings. Over time, however, subsequent acts can shape or focus those meanings." 120 S.Ct. at 1306.[12] In adopting subsequent statutes, Congress is presumed to act "against the backdrop" of agency statements regarding the parameters of the agency's authority to act under the original statute. *Id.* at 1306–07.

**10.** FEHBA is codified at 5 U.S.C. § 8901 *et seq.*

**11.** Even assuming that the Department of Justice should be considered an "agency" for purposes of *Chevron* analysis, it is entitled to no deference for its interpretation of MCRA, FEHBA or Medicare, because it is not the agency entrusted to administer those statutes. "[W]hen an agency interprets a statute other than that which it has been entrusted to administer, its interpretation is not entitled to deference." *Illinois Nat'l Guard v. Federal Labor Relations Authority,* 854 F.2d 1396, 1400 (D.C.Cir.1988) (citations and internal quotations omitted).

**12.** To the extent that the Government contends that the question presented can be resolved by resort to MCRA's language alone, *see* Govt's Opp'n at 14–15, its argument is flatly inconsistent with *Brown & Williamson*'s requirement that statutes like MCRA be viewed in the context of "subsequent acts."

■ Another such principle is that agency "interpretations and practices" should be given "considerable weight where they involve the contemporaneous construction of a statute and where they have been in long use." *Davis v. United States*, 495 U.S. 472, 484, 110 S.Ct. 2014, 109 L.Ed.2d 457 (1990). In fact, congressional action (or inaction) can, in certain circumstances, be viewed by courts as having "effectively ratified" an agency's long-standing position. 120 S.Ct. at 1307.[13]

A final principle announced by the Supreme Court—and one which has more concrete application in the instant case—is that Congress, "for better or for worse, has created a distinct regulatory scheme for tobacco products." 120 S.Ct. at 1315. In conjunction with this scheme, "Congress has persistently acted to preclude a meaningful role for any administrative agency in making policy on the subject of tobacco and health." *Id.* at 1313; *see also id.* at 1309 (Congress' intent was to "preclude any administrative agency from exercising significant policymaking authority on the subject of smoking and health"); *id.* at 1315 (Congress has "repeatedly acted to preclude any agency from exercising significant policymaking authority in the area").

■ The principles delineated above lead this Court to the conclusion that Congress did not intend MCRA to cover Medicare or FEHBA expenses.

### 1. Legislative History

Recourse to MCRA's legislative history cannot by itself answer the question presented (*i.e.*, whether MCRA applies to Medicare and FEHBA expenses), since the record relating to the statute's enactment is virtually non-existent. Nevertheless, even the sliver of legislative history that does exist provides the Court with

"guidance" in understanding how Congress meant MCRA to be interpreted. *See National Wildlife Federation v. Snow*, 561 F.2d 227, 237 (D.C.Cir.1976); *American Soc'y of Travel Agents v. Blumenthal*, 566 F.2d 145, 166 (D.C.Cir.1977) ("Legislative history can be and often is an important instrument in the determination of congressional intent.") (Bazelon, C.J., dissenting).

The parties agree, and the legislative history confirms, that MCRA was enacted in response to a 1947 Supreme Court decision, *United States v. Standard Oil Co.*, 332 U.S. 301, 67 S.Ct. 1604, 91 L.Ed. 2067 (1947), which held that the Government lacked a common law cause of action to recover from tortfeasors expenses the Government had incurred in treating military personnel under its health care programs. *Id.* at 314–16, 67 S.Ct. 1604. *Standard Oil* narrowly construed the Government's authority to recover such expenditures and directed Congress to enact appropriate legislation if it wished to provide the Government with more expansive authority. *Id.* at 315–16, 67 S.Ct. 1604.

For over a decade, Congress apparently ignored *Standard Oil* and did nothing to provide the Government with a statutory cause of action to recover the medical expenses resulting from care it had provided. Finally, in 1960, thirteen years after *Standard Oil* was handed down, the Comptroller General of the United States submitted a Report to Congress entitled "Report On Review Of The Government's Rights And Practices Concerning Recovery Of The Cost Of Hospital And Medical Services In Negligent Third–Party Cases." *See* Govt's Opp'n, Appendix ("App.") at 5. The Report's purpose was to "ascertain the extent, adequacy, and consistency of the rights and practices of the Government to

**13.** *Brown & Williamson* was certainly not the first occasion in which the Supreme Court expressed such a view. In *FTC v. Bunte Bros*, 312 U.S. 349, 352, 61 S.Ct. 580, 85 L.Ed. 881 (1941), the Court stated: "just as established practice may shed light on the extent of power conveyed by general statutory language, so

the want of assertion of power by those who presumably would be alert to exercise it, is equally significant in determining whether such power was actually conferred." *See also Bankamerica Corp. v. United States*, 462 U.S. 122, 130, 103 S.Ct. 2266, 76 L.Ed.2d 456 (1983).

recover" the costs of health care it furnished to tort victims. *Id.* In particular, the Report reviewed the ability of four government agencies to recover their medical costs: the Department of Defense, the Veterans Administration, the Department of Health Education and Welfare's Public Health Service, and the Labor Department's Bureau of Employees' Compensation. *Id.* at 6.

The Report explicitly referred to *Standard Oil* and what the Comptroller General determined the consequence of that decision to be, namely, that "each year the Government is not recovering several million dollars of costs in negligent third-party cases." *Id.* at 14. The Report labeled this outcome "inequitable" and declared that "the Government should have the right in all cases to recover its costs of treating those injured as a result of the negligence of third parties." *Id.* at 10. The Comptroller General therefore recommended that Congress adopt one of two options for remedying the problem: enact legislation "in the form of either a general bill" or amend the statutes governing "the specific agencies involved." *Id.* at 10, 20–21. It should be remembered that Medicare, enacted in 1965, did not exist when the Comptroller General issued his report, in 1960, but FEHBA did.

In response to the Comptroller General's Report, Congress chose the alternative of enacting "a general bill" rather than amending statutes agency by agency. According to the Senate Report on MCRA, the statute's "purpose" was to

> provide for the recovery by the United States from negligent third persons for the cost of hospital, medical, surgical, or dental care and treatment furnished by the United States, pursuant to authority or requirement of law, to a person who is injured or suffers a disease under circumstances creating a tort liability upon such third person.

S.Rep. No. 87–1945 (1962), *reprinted in* 1962 U.S.C.C.A.N. 2637, 2637 (under heading "Purpose"). Both the House and Senate Reports state that MCRA would enable the Government to recover expenses under "[s]tatutes providing for care by the Department of Defense to military personnel and their dependents, the Public Health Service to Coast Guard personnel and other classes of persons, and the Veterans' Administration to veterans." *Id.* at 2639; H. Rep. No. 87–1534, at 5 (1962).

While this language would, by itself, suggest an intent to limit MCRA to the cost of health care provided to members of the military, the very next paragraph of the Senate Report discusses the manner in which the Government would be able to recover payments made under the Federal Employees' Compensation Act ("FECA").[14] Since that statute covers civilian employees, it is clear that MCRA was not meant to be restricted to the military.

The three documents described above (the Comptroller General's Report, the Senate Report and the House Report) constitute MCRA's entire legislative history. However, even more significant than what the legislative history does contain (very little) is what it does not. Despite the fact that the Comptroller General's Report expressly refers to FECA—which both parties agree is covered under MCRA—nowhere in the Report is any mention made of FEHBA, the wide-ranging civilian health insurance program which had been enacted several years earlier, and which the Government now claims is also covered by MCRA. Nor did the Senate or House Reports refer to FEHBA, even in passing. These omissions are, if not in direct conflict, at least in sharp tension with the Government's position that MCRA applies to FEHBA. Surely, Congress knew of FEHBA's existence, especially since that

---

**14.** FECA is codified at 5 U.S.C. § 8132, and provides for unemployment compensation benefits.

statute had been enacted only five years before MCRA.

Although the legislative history, and particularly Congress' failure to make any mention of FEHBA after specifically mentioning other programs covered by the statute, would by itself suggest that MCRA was not meant to apply to FEHBA, the paucity of legislative history necessitates a review of other considerations relating to congressional intent.[15]

### 2. Agency Interpretations

Another tool for ascertaining congressional intent is to examine the statements, rulings and interpretations of government agencies—particularly those agencies entrusted to administer the relevant statute. Because the Health Care Financing Administration ("HCFA") is the agency charged with administering MCRA, its approach to enforcing that statute should be given special attention.

As an initial matter, it cannot be overlooked that HCFA has issued no MCRA-specific regulations providing for recovery of Medicare or FEHBA costs. In contrast, agencies that do have, and have always had, an undisputed and established right to recovery under MCRA, such as those governing the armed services, do have such regulations in place. *See* 32 C.F.R. § 199.12 (Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS") MCRA regulations); 32 C.F.R. §§ 842.115–842.125 (Air Force MCRA regulations); 32 C.F.R. §§ 757.11–757.20 (Navy MCRA regulations); 33 C.F.R. § 25.131 (Coast Guard MCRA regulations).[16] No such structure has ever been established by HCFA to collect Medicare or FEHBA expenses under the general MCRA framework.

Moreover, several agencies have explicitly concluded that MCRA does not provide the Government with a cause of action

15. The Government contends that there is an additional piece of legislative history relating to Medicare, not MCRA, which supports its interpretation of MCRA. The Senate Report accompanying the original Medicare Act states that Medicare will not pay "for any item or service furnished an individual if neither the individual nor any other person (such as a prepayment plan) has a legal obligation to pay for or provide the services," and that under such a circumstance, "the third-party liability statute 42 U.S.C. §§ 2651–2653 [MCRA] would not apply." S.Rep. No. 89–404, at 48 (1965), *reprinted in* 1965 U.S.C.C.A.N.1943, 1989. Although the Government argues that this is a clear indication that Congress intended MCRA to apply to Medicare expenses, Govt's Opp'n at 17, the Court finds this "oblique reference" to the MCRA statute inconclusive at best, especially when it is evaluated in the larger context of near total congressional silence concerning any connection between MCRA and the mammoth Medicare program. *See Regular Common Carrier Conference v. United States,* 820 F.2d 1323, 1328 (D.C.Cir.1987) (finding that "it strains credulity to suggest ... that [a] Senate Report's oblique reference" to a certain exemption "reflects an otherwise unarticulated intent" to apply that exemption in a way never otherwise mentioned in the legislative history).

16. For example, the regulations governing MCRA-recovery of expenses incurred under

CHAMPUS require any person furnished care and treatment under CHAMPUS

(i) To provide complete information regarding the circumstances surrounding an injury as a condition precedent to the processing of a CHAMPUS claim involving possible third-party liability.

(ii) To assign in writing to the United States his or her claim or cause of action against the third person to the extent of the reasonable value of the care and treatment furnished, or to be furnished, or any portion thereof;

(iii) To furnish such additional information as may be requested concerning the circumstances giving rise to the injury or disease for which care and treatment are being given and concerning any action instituted or to be instituted by or against a third person;

(iv) To notify the responsible recovery judge advocate, the CHAMPUS fiscal intermediary or General Counsel, OCHAMPUS, or other officer who is representing the interests of the government at the time, of a settlement with, or an offer of settlement from a third person; and,

(v) To cooperate in the prosecution of all claims and actions by the United States against such third person.

32 C.F.R. § 199.12(e)(2). None of the above mentioned actions is required of recipients of health care under Medicare or the FEHBA program.

to recover Medicare costs. First, in 1968, the General Counsel of the Federal Bureau of Health Insurance (which administered Medicare at that time) issued an Opinion to that effect, stating that Medicare payments are "insurance benefits," as distinguished from the health care "provided directly by the federal government" to which MCRA clearly applied. *See Subrogation Rights Under Medicare,* For the Defense, Apr. 1970, at 44 (Defs.' Mem., App. J at 67). Second, in 1979, HCFA issued a ruling that, in cases in which the Government was liable for an injury under the Federal Tort Claims Act ("FTCA") and Medicare paid the medical expenses, the victim could retain all payments the Government made to her under the FTCA. *See* HCFA Ruling 79–4 (1979), *reprinted in* 52 Fed.Reg. 26,088, 26,090 (1987). The rationale underlying this ruling (that Medicare was not to receive any reimbursement for the care it had provided to the injured person) was that Medicare was "in the nature of social insurance." *Id.*

Since MCRA's enactment in 1962, neither HCFA nor any other administrative agency has ever indicated, or even suggested, that MCRA applies to Medicare or FEHBA expenses. These agency statements and silences, taken in conjunction with the absence of regulations that would formalize and facilitate the Government's recovery of Medicare or FEHBA costs under MCRA, lend further credence to Defendants' position that MCRA was never meant to apply to Medicare or FEHBA expenses.

### 3. Application of the *Brown & Williamson* Principles

Having considered both the legislative history and agency interpretations of MCRA, the Court's final task is to apply the *Brown & Williamson* principles enunciated in Section IV.A.1 to discern what Congress' intent was in enacting MCRA in 1962 and amending it in 1996. Based on this examination, the Court must conclude that MCRA does not provide the Government with a cause of action to recover Medicare or FEHBA expenses. The legis-

lative history and relevant agency conduct, when taken together, overwhelmingly support the notion that MCRA was never intended to be used in the way the Government now advocates.

First, it is significant that even though FEHBA existed *before* MCRA's enactment, MCRA makes *no* reference to FEHBA—either in the statute itself, in the legislative history or in agency interpretations.

Second, it is striking that the Government had never, prior to the initiation of this lawsuit in 1999, attempted to recover Medicare or FEHBA costs under MCRA. Although the Government is correct that mere nonuse of a statute cannot cause the Government to forfeit powers granted thereunder, *see United States v. Morton Salt Co.,* 338 U.S. 632, 647–48, 70 S.Ct. 357, 94 L.Ed. 401 (1950), nonuse can be highly significant. When, despite many opportunities to do so, a government agency refuses to take advantage of the wide-ranging powers seemingly implicated by a statute's plain language, courts may presume that Congress did not intend the statute to be given the meaning that its language, in a vacuum, might imply. *See Brown & Williamson,* 120 S.Ct. at 1306–07; *see also Bankamerica Corp.,* 462 U.S. at 130–31, 103 S.Ct. 2266 (holding that where Government had not applied a statute in a particular way in 60 years, it had effectively acknowledged that it lacked authority to do so); *Bunte Bros.,* 312 U.S. at 352, 61 S.Ct. 580; *National Classification Comm. v. United States,* 746 F.2d 886, 892 (D.C.Cir.1984). This is particularly true in this instance, where the broader interpretation of MCRA (*i.e.,* that every conceivable type of government expenditure, even under Medicare and FEHBA, can be recovered under MCRA) had *never* been advanced by any government entity until thirty-seven years after the statute's enactment.

Third, Congress is presumed to act "against the backdrop" of HCFA's interpretations of the statutes HCFA is entrusted to administer. *See Brown & Wil-*

liamson, *120 S.Ct. at 1306–07.* HFCA consistently indicated that it did not understand MCRA to cover Medicare or FEHBA expenses, and Congress never expressed any disapproval with HFCA's readings of MCRA. In fact, Congress' enactment of the 1996 amendment to MCRA, which the parties agree codified the existing manner in which MCRA was being enforced, can be viewed as a ratification of HFCA's consistent and narrow interpretation of that statute. *120 S.Ct. at 1307.* Congress had the opportunity to express its displeasure with the restrictive way in which MCRA was being enforced, but it did not do so.

Finally, given Congress' intense involvement in legislative regulation of tobacco,[17] and its keen awareness of "tobacco's health hazards and its pharmacological effects," 120 S.Ct. at 1313, it is simply impossible to conclude that the Government's current interpretation of MCRA, either in its original or in its 1996 amended form, is one that Congress intended. In fact, the Government's reading is in direct tension with Congress' recognized intent to create a "distinct scheme to regulate the sale of tobacco products, focused on labeling and advertising, and premised on the belief that the FDA lacks such jurisdiction under the FDCA." *Id.* at 1313. It is therefore particularly difficult to believe that Congress would have intended to subject tobacco companies to extraordinary financial liability under MCRA, when those entities are not even subject to rudimentary FDA regulation.

Congress has, through hearings and legislation, closely monitored the cigarette industry. While, over the years, it may not have adopted the aggressive, pro-consumer and pro-health stance that many activists have continually fought so hard for, the inescapable fact is that Congress chose, as a legislative body, to use only limited measures to regulate tobacco products and minimize their health hazards to the public. In light of all these considerations, it is simply inconceivable that the executive branch possessed for so many years (thirty-seven for FEHBA and thirty-four for Medicare) a statutory weapon that could wield the economic, and therefore regulatory, clout MCRA would carry if enforced as the Government advocates. This is especially true given that there has never been any congressional recognition that this substantial power existed or congressional demand that it be utilized. Congress' total inaction for over three decades "preclude[s] an interpretation" of MCRA that would permit the Government to recover Medicare and FEHBA expenses.[18] *See Brown & Williamson,* 120 S.Ct. at 1312.

Accordingly, the Government's MCRA claim must be dismissed.

## B. The Government's Medicare Secondary Payer Provisions Claim

The Medicare Secondary Payer provisions ("MSP"), a series of amendments to Medicare enacted in 1980 and further amended thereafter,[19] provide the Govern-

---

**17.** For a detailed chronology of congressional action in this area, *see Brown & Williamson,* 120 S.Ct. at 1305–12.

**18.** There is an additional reason that the Court reaches this conclusion. When Congress enacted the 1996 amendment, there was an existing body of case law concerning the "collateral source" doctrine in which federal and state courts have consistently and uniformly declared Medicare to be a separate and distinct "social insurance" fund into which citizens contribute. *See, e.g., District of Columbia v. Jackson,* 451 A.2d 867, 871–872 (D.C.1982); *Molzof v. United States,* 6 F.3d 461, 466 (7th Cir.1993); *Titchnell v. United States,* 681 F.2d 165, 174–76 (3d Cir.1982).

According to these cases, it is not the Government, but rather individuals, who "pay for" Medicare. If this Court were to rule in favor of the Government on the MCRA Count, it would effectively be declaring that the Government "pays for" Medicare, thus undermining the viability of a substantial and longstanding body of case law to the contrary.

**19.** Pub.L. No. 97–35, § 988, 95 Stat. 604 (1981). The amendments are codified at 42 U.S.C. § 1395y, which provides in pertinent part:

In order to recover payment under this subchapter for such an item or service, the United States may bring an action against

ment with statutory authority to obtain reimbursement for certain Medicare expenditures. MSP essentially makes Medicare a "secondary" payer where another entity is required to pay under a "primary plan" for an individual's health care. *See* 42 U.S.C. § 1395y(b)(2). If the "primary" payer has an obligation to pay for such costs, but does not and cannot "reasonably be expected" to do so, Medicare may make a "conditional payment" and later demand reimbursement from the primary plan. 42 U.S.C. § 1395y(b)(2)(A) and (B)(ii). If the entity administering the primary plan refuses to reimburse, the Government may then bring suit against it to recover the Medicare payments.

A "primary plan" is defined in the statute as "a group health plan or large group health plan, . . . a workmen's compensation law or plan, an automobile or liability insurance policy or plan (*including a self-insured plan*) or no fault insurance . . ." 42 U.S.C. § 1395y(b)(2)(A) (emphasis added). A "self-insured plan" is in turn defined in the implementing regulations as an "*arrangement*, oral or written . . . to provide health benefits or medical care or [to] assume legal liability for injury or illness" under which an entity "carries its own risk instead of taking out insurance with a carrier." *See* 42 C.F.R. §§ 411.21 (defining the term "plan") (emphasis added) and 411.50(b) (defining the term "self-insured plan").

It is this last phrase—"self-insured plan"—on which the Government rests its legal basis for Count 2 of this lawsuit. The Government's theory, as expressed in its Opposition to Defendants' Motion to Dismiss, is that Defendants have themselves assumed the liability stemming from tobacco-related tort suits and, therefore, as

"self-insured" entities, may be sued under MSP.

To survive a motion to dismiss, a complaint "must allege all the material elements of [a] cause of action." *Taylor v. FDIC*, 132 F.3d 753, 761 (D.C.Cir.1997) (internal citations omitted); *see also Croixland Properties Ltd. Partnership v. Corcoran*, 174 F.3d 213, 215 n. 2 (D.C.Cir. 1999); *Alicke v. MCI Communications Corp.*, 111 F.3d 909, 912 (D.C.Cir.1997).

The MSP Count of the Government's Complaint states simply that "defendants are required and responsible to make payment for the health care costs of Medicare beneficiaries that were caused by defendants' tortious and unlawful conduct, which costs have been and will be unlawfully shifted to the United States." Compl. at ¶ 170. The Complaint does allege, in other words, that Defendants are "required or responsible . . . to make payment" for certain health care costs, thus tracking a portion of the statute's language. *See* 42 U.S.C. § 1395y(b)(2)(B)(ii).

However, there are a number of "material elements" [20] of an MSP cause of action conspicuously absent from the Complaint. First, the Complaint does not allege, in even the most conclusory fashion, the existence of any "primary plan" under which Defendants pay health care costs, despite the fact that the statute on which the Government bases its claim applies only to entities required to make payment "under a primary plan." *See* 42 U.S.C. § 1395y(b)(2)(B)(ii). In fact, the Complaint does not even allege the existence of any *elements* of a "primary plan," such as a "plan" or an "arrangement." *See* 42 C.F.R. § 411.21. Even if the Complaint had made such allegations, it still fails to allege, or even suggest, that Defendants specifically maintain any form of "*self-insured* plan" (emphasis added), even though this is the *only* theory on which the Government bases Defendants' liability.[21] In-

---

any entity which is required or responsible (directly, as a third-party administrator, or otherwise) to make payment with respect to such item or service (or any portion thereof) under a primary plan . . .

42 U.S.C. § 1395y(b)(2)(B)(ii).

**20.** *See Taylor,* 132 F.3d at 761.

**21.** Although the Government argues *in its brief* that Defendants are a "self-insured plan," it does not make this allegation in the Complaint. In fact, the term "self-insured" appears only once in the entire Complaint. *See* Compl. at ¶ 168 (MSP provisions "provide that the Medicare Program will not pay for the cost of medical care if certain third par-

deed, the Complaint does not allege that Defendants are "self-insured" in any way.

In those instances in which the Government has used MSP to seek recovery from entities that are unquestionably providers of insurance, as is certainly the typical factual scenario,[22] there has been no dispute regarding whether defendants maintain a "primary plan," since that term expressly includes a "group health plan," a "liability insurance policy or plan," and other traditional forms of insurance. *See* 42 U.S.C. § 1395y(b)(2). In those cases, the Government's allegation that defendants are "responsible" for certain health care costs is sufficient to state an MSP claim, as it gives "sufficient information to suggest that there exists some recognized legal theory upon which relief can be granted." *See Wells v. United States*, 851 F.2d 1471, 1473 (D.C.Cir.1988) (internal citations and quotations omitted).

■ In the instant case, however, the claim of "responsibility" to make health care payments is entirely conclusory, since Defendants are clearly not insurance entities and the Complaint is devoid of any allegation that they have established a "plan" or "arrangement" under which they would be considered self-insured entities subject to MSP's reach. Without alleging the existence of such a "plan" or "arrangement," the Complaint's assertion that Defendants are "required and responsible to make payment" for certain health care

costs fails to give Defendants even the most rudimentary notice of the Government's theory of liability. *See Wells*, 851 F.2d at 1473. Accordingly, the MSP count must be dismissed.

## C. The Government's Racketeer Influenced and Corrupt Organizations Claim

■ The Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968, prohibits individuals or entities from engaging in racketeering activity associated with an "enterprise."[23] To successfully state a RICO claim, the Government must allege "(1) the conduct (2) of an enterprise (3) through a pattern of racketeering activity." *Salinas v. United States*, 522 U.S. 52, 62, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997) (citing *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985)).

An enterprise includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." *United States v. Turkette*, 452 U.S. 576, 580, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981) (quoting 18 U.S.C. § 1961(4)). "Racketeering activity" includes, among other things, acts prohibited by any one of a number of criminal statutes. 18 U.S.C. § 1961(1). A "pattern" is demonstrated by two or more instances of "racketeering activity" ("predicate acts")

---

ties—such as liability insurance plans, including self-insured plans—have paid, or can reasonably be expected to pay promptly for those costs). Indeed, the entire MSP Count occupies only slightly more than one page of the 87–page Complaint.

**22.** Courts have uniformly recognized that the statute's clear purpose was to grant the Government a right to recover Medicare costs from insurance entities. *See, e.g., Perry v. United Food and Commercial Workers Dist. Unions 405 and 442*, 64 F.3d 238, 243 (6th Cir.1995); *Baptist Memorial Hosp. v. Pan Am. Life Ins. Co.*, 45 F.3d 992, 998 (6th Cir.1995); *Evanston Hosp. v. Hauck*, 1 F.3d 540, 544 (7th Cir.1993); *see also Health Ins. Ass'n of Am. v. Shalala*, 23 F.3d 412, 427 n. * (D.C.Cir.1994) ("[T]he MSP statute plainly intends to allow

recovery only from an insurer.") (Henderson, J., concurring). What little legislative history exists is consistent with this interpretation. *See* H.R. Conf. Rep. No. 96–1479 (1980), *reprinted in* 1980 U.S.C.C.A.N. 5903, 5924. As of this time, there are no reported decisions in which the Government has sued a tortfeasor under MSP. One case, in which a private party has brought such a suit, is currently being litigated. *See Mason v. American Tobacco Co.*, Civ. No. 7–97CV–293–X (N.D.Tex.).

**23.** Although RICO was originally enacted to "combat organized crime," its application has expanded far beyond that arena. *See, e.g., H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 248, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989).

that occur within ten years of one another. 18 U.S.C. § 1961(5). In this case, the alleged predicate acts are violations of 18 U.S.C. §§ 1341 (mail fraud) and 1343 (wire fraud).

The Government brings its RICO counts (Counts 3 and 4) under two specific subsections of § 1962. Count 3 is brought under subsection (c), which makes it unlawful to "conduct or participate, directly or indirectly," in an enterprise through a "pattern of racketeering activity." Count 4 is brought under subsection (d), which makes it unlawful to "conspire to violate" subsection (c).

RICO provides both legal and equitable remedies. Plaintiffs may seek treble damages—that is, three times the value of the damages inflicted on them by a defendant's unlawful racketeering activity. 18 U.S.C. § 1964(c). In addition, the Court may in its discretion order equitable remedies, "including but not limited to" restricting defendants from taking future actions and even dissolving or restructuring the "enterprise." [24] In the instant case, the Government seeks to "disgorge" Defendants' past profits associated with and derived from their alleged unlawful racke-

teering activity, and to enjoin them from committing future RICO violations.[25]

### 1. Future Injunctive Relief

Except for Liggett,[26] Defendants do not dispute that the Government has adequately alleged the elements of a RICO claim (i.e., "enterprise," "racketeering activity," and "pattern"). What they do dispute is whether the Government has adequately alleged that Defendants' racketeering activity will continue into the future, so as to warrant the broad equitable relief sought.

The Government contends that the pattern of the past four decades in which the tobacco companies have made countless false and deceptive statements, concealed and destroyed documents, and improperly asserted legal privileges to evade legitimate civil discovery and government requests, establishes a "reasonable likelihood," *SEC v. Steadman*, 967 F.2d 636, 647 (D.C.Cir.1992), that Defendants will continue to violate the law. Accordingly, the Government requests equitable relief in the form of disgorgement of the profits they have realized from their criminal activities, for the purpose of deterring De-

---

**24.** Section 1964(a) states in full:

The district courts of the United States shall have jurisdiction to prevent and restrain violations of section 1962 of this chapter by issuing appropriate orders, *including, but not limited to:* ordering any person to divest himself of any interest, direct or indirect, in any enterprise; imposing reasonable restrictions on the future activities or investments of any person, *including, but not limited to.* prohibiting any person from engaging in the same type of endeavor as the enterprise engaged in, the activities of which affect interstate or foreign commerce; or ordering dissolution or reorganization of any enterprise, making due provision for the rights of innocent persons.
18 U.S.C. § 1964(a) (emphasis added).

**25.** Specifically, the Government requests that the Court issue a "permanent injunction" to prohibit Defendants and their agents, employees and successors from (1) associating with persons known "to be engaged in [similar] acts of racketeering"; (2) participating in the management or control of CTR or TI; (3) making misleading statements concerning

cigarettes; and (4) engaging in "any public relations endeavor that misrepresents, or suppresses information concerning, the health risks associated with cigarette smoking or the addictive nature of nicotine." Compl. § VII.B.2.

The Government also requests that Defendants be ordered to (1) fund, but have no influence or control over, "a legitimate and sustained corrective public education campaign"; (2) disclose and disseminate documents relating to the targeting of children; (3) make "corrective statements regarding the health risks of cigarette smoking and the addictive properties of nicotine"; (4) fund, but have no influence or control over, "sustained [cigarette smoking] cessation programs"; and (5) fund, but have no influence or control over, "a sustained educational campaign devoted to the prevention of smoking by children. *Id.*

**26.** Liggett's separate arguments will be addressed in Section V of this Opinion.

fendants and others from committing such acts in the future. Govt's Opp'n, at 92.

Defendants concede that "past allegations may be relevant to whether ... a 'reasonable likelihood' exists" that such acts will continue into the future, Defs.' Mem. at 65, but argue that the Government's exclusive reliance on these past violations and its speculative allegations of future misconduct are too "conclusory" to justify equitable relief. Defs.' Mem. at 68. Defendants contend that, under the law of this Circuit, the Government may not rely solely on allegations of earlier unlawful activity to warrant the imposition of equitable relief. Defs.' Mem. at 66 n.* (citing *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1228 (D.C.Cir.1989)). Defendants also argue that, because the RICO predicate acts in this case involve mail and wire fraud, the command of Federal Rule of Civil Procedure 9(b) that allegations of fraud be made with "particularity" is applicable, and that the Government has failed to make the particularized showing required by this Rule. Defs.' Mem. at 67–68.

Finally, Defendants argue that the Master Settlement Agreement ("MSA") which they entered into with the States enjoins Defendants from engaging in the same unlawful activity which the Government believes will occur in the future. Defendants point to various specific M.S.A. § provisions that they contend will make equitable relief in this action unnecessary and unwarranted. Accordingly, they argue that their "business" (manufacturing, selling and marketing tobacco products) will not present "opportunities to violate the law in the future," Defs.' Mem. at 66 n.* (citing *First City*, 890 F.2d at 1228).

The Government responds that, applying the three factors announced in *First City*, there is indeed a "reasonable likelihood" that Defendants' past unlawful conduct will continue into the future. Govt's Opp'n at 86. The Government maintains it would be able to prove at trial that the past conduct alleged "would provide strong support for an inference of a risk of future wrongdoing," and that, to the extent that

Defendants argue that the Government is required to make such a showing now, at the motion to dismiss stage, rather than at trial, they are simply mistaken. Govt's Opp'n at 87.T h e Government also denies that it is required to plead the likelihood of Defendants' future acts of fraud with particularity under Fed.R.Civ.P. 9(b). It argues that the core purpose of 9(b) is to protect defendants from reputational harm and "strike" suits, and to provide them with "sufficient information to respond to plaintiff's claims." *Firestone v. Firestone*, 76 F.3d 1205, 1211 (D.C.Cir.1996). Finally, the Government contends that Defendants' reading of Rule 9(b) would "demand access to a crystal ball," Govt's Opp'n at 90, because it would force plaintiffs to describe the detailed contours of acts which have not yet occurred.

■ To obtain injunctive relief in this Circuit, a plaintiff must show that the defendant's past unlawful conduct indicates a " 'reasonable likelihood of further violation(s) in the future.' " *SEC' v. Kenton Capital, Ltd.*, 69 F.Supp.2d 1, 15 (D.D.C. 1998) (Kollar–Kotelly, J.) (quoting *SEC v. Savoy Ind., Inc.*, 587 F.2d 1149, 1168 (D.C.Cir.1978)); *SEC v. Bilzerian*, 29 F.3d 689, 695 (D.C.Cir.1994).

■ To determine whether there is a "reasonable likelihood" of future violations, the following factors must be considered: "[1] whether a defendant's violation was isolated or part of a pattern, [2] whether the violation was flagrant and deliberate or merely technical in nature, and [3] whether the defendant's business will present opportunities to violate the law in the future." *First City*, 890 F.2d at 1228 (citing *Savoy Indus.*, 587 F.2d at 1168); *Bilzerian*, 29 F.3d at 695. None of these three factors is determinative; rather, "the district court should determine the propensity for future violations based on the totality of circumstances." *First City*, 890 F.2d at 1228 (citing *SEC v. Youmans*, 729 F.2d 413, 415 (6th Cir.1984)).

The Government has clearly and overwhelmingly satisfied each of the three *First City* factors. First, Defendants cannot possibly claim that their alleged conspiratorial actions were "isolated." On the contrary, the Complaint describes more than 100 predicate acts spanning more than a half-century. Second, Defendants cannot contend that the alleged RICO violations are "technical in nature." The Government alleges that Defendants' numerous misstatements and acts of concealment were made intentionally and deliberately, rather than accidentally or negligently, as part of a far-ranging, multifaceted, sophisticated conspiracy. Third, Defendants' business of manufacturing, selling and marketing tobacco products clearly "present[s] opportunities to violate the law in the future." *First City*, 890 F.2d at 1228. As the Government points out, as long as Defendants are in the business of selling and marketing tobacco products, they will have countless "opportunities" and temptations to take unlawful actions, just as it is alleged they have done since 1953. Govt's Opp'n at 87.

Defendants' contention that the M.S.A. § precludes such opportunities is not persuasive. *See* Defs.' Mem. at 70–77. In arguing that the M.S.A. § obviates the need for injunctive relief, Defendants implicitly ask the Court to make the following two assumptions: that Defendants have complied with and will continue to comply with the terms of the MSA, and that the M.S.A. § has adequate enforcement mechanisms in the event of noncompliance. Even assuming the Court could take judicial notice of the MSA, that document's existence certainly does not mean that the Court can or should assume that the M.S.A. § will be fully enforced or otherwise accomplish its intended objectives.

Further, the decisions Defendants cite for the proposition that past allegations of wrongdoing alone cannot warrant injunctive relief are inapposite, because those cases all discuss the standard for *proving* a reasonable likelihood of future violations, not for *pleading* it at the motion to dismiss stage. *See, e.g., SEC v. Commonwealth Chem. Secs,* 574 F.2d 90, 100 (2d Cir.1978); *SEC v. Blatt,* 583 F.2d 1325, 1334 (5th Cir.1978).

Indeed, the sole decision cited by Defendants which does address the injunctive relief standard appropriate for a motion to dismiss, *SEC v. Cassano,* 61 F.Supp.2d 31 (S.D.N.Y.1999), clarifies the distinction between those two very different legal standards. In *Cassano*, the court recognized that it was "obliged to accept the truth" of the Government's allegation that defendants are "likely to violate securities laws in the future," "for purposes of this motion to dismiss, and so this aspect of the defendants' motion must be denied. Whether the [Government] can prove the allegation remains to be seen." *Id.* at 34. The same can be said of the instant case.

Finally, Defendants' contention that the Government "must allege "a 'reasonable likelihood' of future violations— future frauds—with the specificity required by Rule 9(b)," Defs.' Mem. at 67, simply defies common sense. It is difficult to see how a plaintiff could ever allege with "particularity" an offense which has not yet happened. Defendants are able to cite only two decisions, both of which are from other circuits, in support of this contention: *Menasco, Inc. v. Wasserman,* 886 F.2d 681 (4th Cir.1989) and *Continental Realty Corp. v. J.C. Penney Co.,* 729 F.Supp. 1452 (S.D.N.Y.1990).

In *Menasco*, the defendant's actions "involved a limited purpose," "one perpetrator," "one set of victims," and the racketeering transaction "took place over approximately one year." 886 F.2d at 684. The court specifically held that defendant's acts, as alleged, did not "suggest a 'distinct threat of long-term racketeering activity, either implicit or explicit.' " *Id.* (quoting *H.J. Inc.,* 492 U.S. at 242, 109 S.Ct. 2893). It was on this basis, and these facts, that the court determined that plaintiff's allegations of on-going fraud missed the Rule 9(b) mark. In

*Continental Realty,* the court observed that plaintiff's attempt to "infer a threat of repeated fraud from a single alleged scheme would in effect render [RICO's] pattern requirement meaningless." 729 F.Supp. at 1455. Therefore, the court declared that plaintiff's allegations did not pass Rule 9(b) muster.

In neither decision—nor any other decision cited by Defendants, for that matter—did the plaintiff allege as many predicate acts (116), as long a duration of racketeering activity (45 years), as many significant participants (11 entities, which together control virtually the entire tobacco products market), as many victims (hundreds of millions of individuals, scores of government entities, the federal government) or as much money derived from the racketeering acts (hundreds of billions of dollars).

Based on the sweeping nature of the Government's allegations, and the fact that the parties have barely begun discovery to test the validity of these allegations, it would be premature for the Court to rule on the propriety of injunctive relief in this case. At a very minimum, the Government has stated a claim for injunctive relief; whether the Government can prove it, "remains to be seen."

## 2. The Specific Equitable Relief of Disgorgement

Defendants contend that even if the Government has alleged the likelihood of future illegal activity, it is still not entitled to the remedy of disgorgement,[27] because that particular remedy is never available under a civil RICO count. Defendants contend that civil RICO remedies must be forward-looking, while disgorgement is, by its very nature, backward-looking. *See* Defs.' Mem. at 80. They argue that the Government is impermissibly attempting to convert its civil RICO count into a criminal one by asking for disgorgement, which is akin to criminal forfeiture of the

proceeds of unlawful activity (and permitted only under criminal, not civil, RICO suits). Defendants contend that RICO is to be "read *in pari materia* with the Clayton Act, from which it is in large part derived," Defs.' Mem. at 80, and that disgorgement is not permitted under that act. Finally, Defendants argue that disgorgement in this case would be "impermissibly punitive" and would constitute a double recovery, since the Government already seeks billions of dollars in damages under the Complaint's MCRA and MSP counts. Defs.' Mem. at 82.

The Government argues that disgorgement is an available and appropriate remedy for civil violations of RICO, and that Defendants' claims to the contrary are, in addition to being legally incorrect, premature at this stage. The Government argues that RICO's plain language does not foreclose disgorgement, and that the Supreme Court has held disgorgement generally available unless a particular statute, "by a necessary and inescapable inference, restricts the court's jurisdiction in equity." *Porter v. Warner Holding Co.,* 328 U.S. 395, 398–99, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946). The Government rejects Defendants' argument that disgorgement is backward-looking and punitive, arguing that it is in fact remedial and may properly serve as a deterrent to Defendants and others who may contemplate committing similar offenses. In addition, the Government contends that disgorgement in this case would in fact serve a forward-looking purpose, namely, to prevent Defendants from using proceeds from prior illegal activities as "capital available for the purpose of funding or promoting [future] illegal conduct." Govt's Opp'n at 98 n. 70 (quoting *United States v. Private Sanitation Indus. Ass'n,* 914 F.Supp. 895, 901 (S.D.N.Y.1996)).

The only court of appeals to consider the question of whether disgorgement is an

---

**27.** The Government seeks to disgorge all the profits that Defendants derived from past unlawful conduct related to the alleged RICO enterprise, beginning in 1953 and continuing to the present.

appropriate civil RICO remedy, the Second Circuit, has answered in the affirmative. *See United States v. Carson*, 52 F.3d 1173 (2d Cir.1995). The Second Circuit concluded, based on § 1964's plain language[28] and its legislative history, that disgorgement is permitted in civil RICO suits. The court stated that "the legislative history of § 1964 indicates that the equitable relief available under RICO is intended to be 'broad enough to do all that is necessary.'" *Id.* at 1181–82 (quoting S.Rep. No. 617, 91st Cong., 1st Sess. at 79 (1969)).

■ Even before the Second Circuit's decision in *Carson*, district courts within the Second Circuit had reached the same conclusion. *See United States v. Bonanno Organized Crime Family of La Cosa Nostra*, 683 F.Supp. 1411, 1442–49 (E.D.N.Y. 1988), *aff'd on other grounds*, 879 F.2d 20 (2d Cir.1989); *United States v. Private Sanitation Indus. Ass'n*, 793 F.Supp. 1114, 1151–52 (E.D.N.Y.1992); *United States v. Int'l Bhd. of Teamsters*, 708 F.Supp. 1388, 1408 (S.D.N.Y.1989). Given that the only circuit to have addressed the issue has declared, in a well-reasoned and persuasive opinion, that disgorgement is permissible in civil RICO claims, and given that Defendants cannot point to a single federal court that has declared otherwise, this Court is not inclined to categorically rule out that remedy at the motion to dismiss stage.

Defendants argue that because RICO was modeled after the Clayton Act, 15 U.S.C. § 26, and because a judge of this District Court has declared disgorgement to be unavailable under the Clayton Act, *FTC v. Mylan Labs., Inc.*, 62 F.Supp.2d 25, 40–42 (D.D.C.1999) (Hogan, J.), disgorgement should likewise be unavailable under civil RICO. Defendants do not explain, however, why this Court should rely on non-binding federal district court case law under a different statute, when there is persuasive case law—albeit from another circuit—on the precise statute at issue.

Further, the Supreme Court has not, as Defendants contend, declared that the Clayton Act and RICO should be read "*in pari materia.*"[29] Defs.' Mem. at 80. Rather, the Supreme Court has held that while the "Clayton Act analogy is *generally* useful in civil RICO cases," particular case law interpreting the Clayton Act "may not apply without modification in every civil RICO case." *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 180, 117 S.Ct. 1984, 138 L.Ed.2d 373 (1997) (emphasis added). Equally important is the fact that Judge Hogan's primary concern in *Mylan Labs*—the possibility of "duplicative recoveries"—is not applicable in this case, since the Court is granting Defendants' motion to dismiss the non-RICO claims. Accordingly, the Government is provided with only one "route to defendants' allegedly ill-gotten gains," namely, its civil RICO suit. 62 F.Supp.2d at 41.

■ The Court of Appeals in *Carson* observed that whether disgorgement is appropriate in a particular case depends on whether there is a "*finding*" that the gains are being used to fund or promote the illegal conduct, or constitute capital available for that purpose." 52 F.3d at 1182 (emphasis added). This Court has not made such a finding, nor could it at this stage. So long as disgorgement is permitted in civil RICO suits as a matter of law, as the Court so concludes, it would not be appropriate to ask, at the present stage, whether the Government has proved that it has an adequate basis for seeking such a remedy. Accordingly, the Court will permit the Government to pursue the

---

28. *See supra* note 24 for the relevant text of § 1964.

29. In fact, this Latin phrase, which roughly translated means "on the same matter," and which would suggest that the Clayton Act and RICO should be read in a way to avoid inconsistencies in their respective interpretations, is not even used in either *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 117 S.Ct. 1984, 138 L.Ed.2d 373 (1997), or *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992), the two Supreme Court decisions Defendants cite.

remedy of disgorgement and the motion to dismiss as to this claim must be **denied.**

### V. *Liggett's Motion To Dismiss RICO Counts*

Although Liggett joins the other Defendants' "broad arguments of general applicability to the Complaint," Memorandum of Liggett in Support of Motion to Dismiss the Complaint ("Liggett Mem.") at 1, it has filed its own motion to dismiss the Complaint's RICO counts, advancing some additional grounds in support thereof.

#### A. The RICO Elements

Liggett argues that the Government has not sufficiently alleged, as to it, two of the four elements required for a RICO claim: "enterprise" and "pattern of racketeering activity".[30]

#### 1. RICO's "Enterprise" Element

■■ As defined earlier, an "enterprise," as that term is used in a RICO claim, is "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." *Turkette,* 452 U.S. at 580, 101 S.Ct. 2524. It need not have a formal hierarchy or framework, "so long as it involves some structure, to distinguish an enterprise from a mere conspiracy." *United States v. Richardson,* 167 F.3d 621, 625 (D.C.Cir. 1999) (internal citations and quotations omitted). The three elements necessary to establish an enterprise are: "(1) a common purpose among the participants, (2) organization, and (3) continuity." *United States v. Perholtz,* 842 F.2d 343, 362 (D.C.Cir.1988).

Liggett argues that the Government has not adequately alleged the existence of an enterprise. Specifically, Liggett contends that the Government has failed to show that the putative enterprise had the requisite "organization." According to Liggett, the Complaint makes only conclusory allegations, without describing how the enterprise operated, who its leaders were, or

how its decision-making process functioned. *See* Liggett Mem. at 25–26.

■■ The Court concludes that the Complaint properly alleges the existence of an enterprise, and Liggett's involvement therein. "It is clear an enterprise can be established through an informal group of people who come together for the common purpose of obtaining financial gain through criminal activity." *United States v. Cooper,* 91 F.Supp.2d 60, 68 (D.D.C.2000) (Joyce Green, J.) (citations omitted). The enterprise can be as simple as an "amoeba-like infra-structure that controls a secret criminal network." *United States v. Elliott,* 571 F.2d 880, 898 (5th Cir.1978).

■■ Liggett's argument that the Government must spell out the mechanics or logistics of the enterprise is unsupported by the case law. Numerous courts, in this Circuit and others, have established that the kind of allegations contained in the Government's Complaint are easily sufficient to survive a Rule 12(b)(6) motion. For example, in *Perholtz,* the complaint stated: "Defendant ... constituted an enterprise ... to wit, a group of individual, partnerships, and corporations associated in fact to unjustly enrich themselves from the proceeds of government contracts ..." 842 F.2d at 351, n. 12. And in *Private Sanitation Ind. Ass'n,* 793 F.Supp. 1114, the complaint stated that the enterprise was "a group composed of, but not limited to" 112 defendants "associated-in-fact for the purpose of controlling the waste disposal industry in Long Island." *Id.* at 1126. In both cases, the allegations were deemed sufficient to survive a motion to dismiss. In the instant case, the Complaint alleges that Defendants decided on a joint objective to "preserve and expand the market for cigarettes and to maximize" their profits and "agreed that the strategy they were implementing was a 'long-term one' that required defendants to act in concert with each other on the current health controversy, as well as on issues

---

**30.** *See supra* Section IV.C, at 33–35.

that would face them in the future." Compl. at ¶¶ 33–34. The nature of these allegations is at least as detailed as those made in *Perholtz* and *Private Sanitation,* if not more so. Accordingly, the Government has adequately pleaded the enterprise element.

## 2. RICO's "Pattern Of Racketeering Activity" Element

A "pattern of racketeering activity" is defined as "at least two acts of racketeering activity" committed within a ten year period. In this case, as already noted, the Government relies on violations of 18 U.S.C. §§ 1341 (mail fraud) and 1343 (wire fraud) as the "predicate acts" which transform Defendants' alleged misconduct into "racketeering activity." 18 U.S.C. § 1961(5). The mail fraud statute [31] provides that "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises ... for the purpose of executing such scheme or artifice or attempting so to do," mails or causes the mailing of any matter, is guilty of mail fraud. 18 U.S.C. § 1341.

■ Liggett argues that the Complaint does not allege convergence between the party deceived (individual smokers) and the party whose property was injured (the Government); according to Liggett, it was the Government that suffered economic injury, not individual smokers. Liggett Mem. at 29–30. Liggett's convergence argument misstates the relevant case law. A defendant who uses the mail with the *intent* of defrauding someone of property is guilty (or in this case, liable), whether the attempt succeeds or not. *See, e.g., Carpenter v. United States,* 484 U.S. 19, 26–27,

108 S.Ct. 316, 98 L.Ed.2d 275 (1987); *United States v. Pollack,* 534 F.2d 964, 971 (D.C.Cir.1976). According to the Complaint's allegations, Defendants did *intend* to defraud individual smokers of their property (*i.e.,* the money they spent on cigarettes).[32] Moreover, the Complaint also alleges—though it need not—that Defendants *succeeded* in defrauding individual smokers. *See* Compl. at ¶¶ 204(b)—(d).

Liggett also argues that the Complaint fails to meet the pleading standard of Federal Rule of Civil Procedure 9(b), which requires that "the circumstances constituting fraud ... shall be stated with particularity." To satisfy this standard, a complaint must specify "the time, place and content of the false misrepresentations, the fact misrepresented and what was retained or given up as a consequence of the fraud." *Firestone,* 76 F.3d at 1211 (internal quotations and citation omitted).

■ The Appendix to the Complaint does describe the time, place, and content of each allegedly fraudulent act, states the fact(s) misrepresented, and names the particular Defendants involved. *See* Appendix at ¶¶ 13, 17, 22, 28, 31, 44, 66, 67, 70, 73, 77, 88, and 112. Although each allegation does not, in its body, include a statement of "what was retained or given up as a consequence of the fraud," *Firestone,* 76 F.3d at 1211, the Complaint does allege elsewhere that the item "given up" was the money the Government spent on tobacco-related health care. *See* Compl. at ¶ 6. Accordingly, the Complaint alleges the mail fraud acts with sufficient particularity.

---

31. The mail fraud and wire fraud statutes are construed identically. *See, e.g., United States v. Lemire,* 720 F.2d 1327, 1335 n. 6 (D.C.Cir. 1983) (citations omitted). At any rate, since thirteen of the fourteen acts of racketeering alleged against Liggett are mail fraud, and since a "pattern of racketeering activity" requires two or more acts, it is the mail fraud, not the wire fraud, analysis which is dispositive in this case.

32. The Complaint states: "Defendants and others known and unknown did knowingly and intentionally devise and intend to devise a scheme and artifice to defraud, and obtain money and property from, members of the public." Compl. at ¶ 204(a).

**154**

### B. Liggett's Alleged Withdrawal From the Conspiracy

Liggett also argues that, regardless of whether the Government has generally satisfied the RICO elements, Liggett has "withdrawn" from the enterprise, and accordingly the Complaint fails to adequately allege the "enterprise" element as to Liggett and/or the need for injunctive relief against it.

Liggett contends that the "public record" amply demonstrates that it is no longer acting in concert with the other Defendants, and that there is no reasonable likelihood it will commit unlawful acts in the future to warrant injunctive relief. Even if the Court were precluded from considering these outside sources, Liggett contends that it is "plain from the face of the Complaint that Liggett poses no risk of committing future acts of racketeering activity" and that the Complaint "does not, and indeed cannot, make any allegation that Liggett poses a risk of any future violations of RICO." Liggett Mem. at 19.

The Government responds that this Court is "limited to consideration of the facts alleged in the four corners of the complaint," which do not indicate that Liggett has withdrawn. Opp'n to Liggett at 10. The Government also contends that it would be premature, at this early stage, for the Court to determine whether Liggett threatens to commit future illegal acts or not.

 Although courts may take the "public record" into account when deciding motions to dismiss,[33] that record includes only certain official documents, not mere newspaper articles.[34] Liggett's evidentiary support for its claim to have withdrawn from the enterprise consists almost exclusively of quotations from newspaper articles or from government reports that are neither part of a public record nor matters for judicial notice.[35] See Liggett Mem. at 5–10. Accordingly, the Court may not take these documents into account.

 Without reference to the sundry newspaper clippings Liggett cites, its claim to have withdrawn from the enterprise is wholly unpersuasive. To establish that it is no longer a member of the enterprise, Liggett must show that it "withdrew from the conspiracy by an affirmative act designed to defeat the purpose of the conspiracy." See In Re Corrugated Container Antitrust Litig., 662 F.2d 875, 886 (D.C.Cir.1981). Because withdrawal is an affirmative defense, the affirmative acts listed above must "clearly appear[ ] on the face of the complaint." Fortner v. Thomas, 983 F.2d 1024, 1028 (11th Cir.1993).

The Complaint is devoid of any affirmative acts by Liggett that would indicate its withdrawal from the RICO enterprise. On the contrary, the Complaint expressly states that "[f]rom at least the early 1950's and *continuing up to and including the date of the filing of this complaint* . . . Liggett . . . did unlawfully, knowingly and intentionally" conduct and participate in, and conspire to participate in, the enterprise's affairs. Compl. at ¶¶ 172, 201 (emphasis added).

**33.** *See, e.g., Marshall County Health Care Auth. v. Shalala,* 988 F.2d 1221, 1222, 1226 n. 6 (D.C.Cir.1993); *Phillips v. Bureau of Prisons,* 591 F.2d 966, 969 (D.C.Cir.1979).

**34.** Public records are "[r]ecords, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report . . . or (C) in civil actions and proceedings . . . , factual findings resulting from an investigation made pursuant to authority granted by law." Fed.R.Evid. 803(8).

**35.** The Court is aware of only one relevant document cited by Liggett which is possibly part of the public record: a report issued by the Federal Trade Commission entitled "Competition and the Financial Impact of the Proposed Tobacco Settlement" (Sept.1997). *See* Liggett Mem. at 3. However, Liggett does not quote from the report or indicate in any way how it would establish Liggett's withdrawal from the enterprise.

Despite Liggett's attempt to use the Complaint's language to show that it is now a fully law-abiding corporate citizen, the above quoted language from the Complaint adequately alleges that Liggett is likely to commit certain racketeering acts in the future. In addition, given the complex nature of the Government's allegations, and the fact that numerous allegations simply refer to "Defendants"—without expressly excluding Liggett[36]—it would be premature at this time to preclude the Government from pursuing injunctive relief.

Accordingly, Liggett's separate motion to dismiss the Government's RICO Count must be **denied.**

### V. *Conclusion*

For the reasons stated at length above, Certain Defendants' Motion to Dismiss for Failure to State a Claim [# 72] is **granted in part and denied in part.** The motion is **granted** as to Count 1 (the Medical Care Recovery Act claim), **granted** as to Count 2 (the Medicare Secondary Payer claim), and **denied** as to Counts 3 and 4 (the Racketeer Influenced and Corrupt Organization Act claims). The Liggett Group Inc.'s Motion to Dismiss for Failure to State a Claim [# 70] is **denied.**

An Order will issue with this Opinion.

---

**36.** *See, e.g.,* Compl. at ¶ 208 ("After a span of more than forty-five years of deception and fraud, it would be unreasonable to believe that *defendants* will voluntarily cease their unlawful conduct, or that their pattern of racketeering activity will cease without intervention by this Court.") (emphasis added).