## In re ORTHOPEDIC BONE SCREW PRODUCTS LIABILITY LITIGATION.

Daniel C. Fanning

v.

United States of America, et al.

Fanning, et al.

v.

AcroMed Corporation, et al. and All Actions.

MDL No. 1014.
Civ.A. Nos. 01–1029, 97–381.

United States District Court,
E.D. Pennsylvania.

June 29, 2001.

Arnold Levin, Michael D. Fishbein, Levin, Fishbein, Sedran & Berman, Philadelphia, PA, for plaintiff.

Cynthia L. Alexander, U.S. Department of Justice, Civil Division, Commercial Litigation Branch, for defendant.

Robert E. Welsh, Jr., Welsh & Recker, P.C., Philadelphia, PA, pro se.

Stephen S. Phillips, Pepper, Hamilton & Scheetz, Richard R. Galli, Galli, Reilly & Stellato, Jeffrey B. Albert, Fox, Rothschild, O'Brien & Frankel, LLP, Arlin M. Adams, Schnader, Harrison, Segal & Lewis, Arnold Levin, Levin, Fishbein, Sedran & Berman, Robert E. Welsh, Jr., Philadelphia, PA, Russell M. Pelton, Oppenheimer, Wolff and Donnelly, Chicago, IL, Jennifer E. Kaplan, U.S. Department of Justice, Civil Division, Washington, DC, fo Orthopedic Bone Screw Products Liability Litigation.

### MEMORANDUM AND PRETRIAL ORDER NO. 2000

BECHTLE, District Judge.

Presently before the court are plaintiff Daniel C. Fanning's motions for class certification and for preliminary injunction and defendant the United States of America, et al.'s motion to dismiss the Amended Complaint in 01–cv–1029 ("*Fanning II*"); plaintiff Fanning, et al.'s ("Plaintiffs") motion to require distribution of the settlement proceeds in 97–cv–381 ("*Fanning I*"); the oppositions and responses thereto; and the exhibits and testimony received by the court at a consolidated hearing on the motions held on June 6, 2001. For the reasons set forth below, the motions for class certification, for preliminary injunction and for distribution of the settlement proceeds will be granted, and the motion to dismiss will be granted in part and denied in part.

### I. BACKGROUND

In August 1994, the Judicial Panel on Multidistrict Litigation transferred all cases pending in federal trial courts against manufacturers of orthopedic bone screws, including AcroMed Corporation ("AcroMed"), to this court for pretrial purposes under 28 U.S.C. § 1407. On October 17, 1997, the court issued a Final Order and Judgment approving a limited fund class action settlement between Plaintiffs and AcroMed and certifying a settlement class. *In re Orthopedic Bone Screw Prods. Liab. Litig.*, 176 F.R.D. 158 (E.D.Pa.1997) ("*In re Bone Screw*"). Pursuant to the terms of the settlement agreement, AcroMed placed $100 million into an interest-bearing fund (the "AcroMed Settlement Fund").[1] *Id.* at 165–66.

In April 1997, defendant the United States of America, et al. (the "Government") first asserted its right to recover costs expended by its constituent agencies under the Medicare Secondary Payer statute, 42 U.S.C. § 1395y ("MSP") and the Medical Care Recovery Act, 42 U.S.C. § 2651–53 ("MCRA"). (P–5 at 3–8; United States' Statement of Interest at 1.) Today, the Government's claims continue to contribute to delay in the distribution of settlement proceeds.[2]

On March 1, 2001, Plaintiffs filed a motion to require distribution of the settlement proceeds without regard to the Government's claims in *Fanning I*. That same day, plaintiff Daniel C. Fanning brought suit against the Government in *Fanning II*, asserting that the Government had no right on account of the AcroMed settlement to recover payments previously made by any Government agency to class members and seeking to enjoin the Government from attempting such recovery from class members.[3]

---

**1.** The court incorporates by reference *In re Orthopedic Bone Screw Prods. Liab. Litig.*, 176 F.R.D. 158 (E.D.Pa.1997) which contains, *inter alia*, a description of the course of this litigation.

**2.** For example, in what turned out to be a disappointing extension of cooperation by the settled parties and the claims administrator, the Government was given a complete list of class members from which to identify and quantify its claims. On numerous occasions between the summer of 1999 and the present, the Government was provided with computer databases with information concerning registered class members. (P–6 at 4–

5.) Not until December 2000, however, did the Government make its first specific demand for payment to settle all of its Medicare related claims. This delay resulted from the Government having taken eight months to extract data concerning beneficiaries from its National Database, four months to filter out non-bone screw and otherwise irrelevant expenditures, and additional time to more accurately estimate its claims.

**3.** Fanning filed an Amended Complaint on June 22, 2001.

On May 7, 2001, following the filing of the Complaint in *Fanning II,* the Health Care Financing Administration ("HCFA") sent letters to approximately 1,800 Medicare beneficiaries in the AcroMed Settlement Class, demanding repayment for amounts that Medicare allegedly furnished in relation to injuries that were the subject of the tort claims against AcroMed.[4] In pertinent part, the demand letters stated:

Medicare has determined that you are required to reimburse the Medicare program [a specified sum] for amounts it paid for items or services relating to your orthopedic bone screw settlement with AcroMed Corporation. Federal law requires Medicare beneficiaries who obtain a liability recovery to repay the United States the amount the Medicare program paid for conditions related to that recovery....

You must pay this amount within sixty (60) days of the date of this letter (by July 9, 2001)....

If you do not pay this amount by July 9, 2001, you will be required to pay interest from the date of this letter. Interest will be calculated at the rate of 13.75% per annum in accordance with 42 C.F.R. 411.24(m). Interest will continue to accrue until the debt is paid, whether or not a waiver of recovery request or appeal is pending.

If you do not pay this amount, the Medicare program may recover the amount from any Social Security or Railroad Retirement benefits to which you might otherwise be entitled, or the money may be recouped from payments Medicare would otherwise pay you.

(Pl.'s Mem. of Law in Opp'n to Defs.' Mot. to Dismiss and in Supp. of Pl.'s Mots. 1) to Am.Compl.; 2) for Class Cert.; 3) for Summ.J. Including Final Declaratory and Injunctive Relief and 4) for T.R.O. and/or Prelim. Inj. ("Pl.'s Opp'n") Ex. F.) In the Amended Complaint, Fanning asserts, *inter alia,* that the Government's demand, made pursuant to the MSP, is contrary to law, arbitrary and capricious, and violates the Constitutional rights of class members to procedural due process. (Am.Compl.¶¶ 24–54.)

## II. *DISCUSSION*

Plaintiff Daniel C. Fanning seeks class certification and a preliminary injunction in *Fanning II,* whereas defendant the United States of America, *et al.* seeks dismissal of the Amended Complaint. In addition, plaintiff Fanning, *et al.* seeks an order requiring distribution of the settlement proceeds in *Fanning I.*

The court will first discuss the motions for class certification and for preliminary injunction. Then, the court will discuss the motion to dismiss. Finally, the court will discuss the motion to require distribution of the settlement proceeds.

### A. *Class Certification*

To certify a class, the court must first find that: 1) the class is so numerous that joinder of all members is impracticable; 2) there are questions of law or fact common to the class; 3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and 4) the representative parties will fairly and adequately protect the interests of the class. Fed.R .Civ.P. 23(a).

If the requirements of Rule 23(a) are satisfied, the parties must then establish that the suit fits within one of three categories of Rule 23(b). *In re Bone Screw,* 176 F.R.D. at 172 (citing *Weiss v. York Hosp.,* 745 F.2d 786, 807 (3d Cir.1984)). Fanning seeks certification pursuant to Rule 23(b)(2), under which "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief with respect to the class as a whole." For the reasons discussed below, the court finds that the suit fits within the requirements of Rule 23(a) and Rule 23(b)(2).

---

4. It is not contested that HCFA did not provide class members with notice of the reimbursement claim prior to its demand for payment or an opportunity to demonstrate that there was no reimbursement liability because, for example, Medicare paid for services that were unrelated to any injury allegedly caused by AcroMed. (P–11 & Exs. 1–30.)

### 1. Numerosity

Rule 23(a)(1) permits class action treatment where "the class is so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1). There are no specific standards regarding class size and it is not necessary for a plaintiff to allege the exact number of class members to satisfy the numerosity requirement. *In re Bone Screw,* 176 F.R.D. at 173 (citation omitted).

To date, 1,800 class members have received demand letters from HCFA.[5] Thus, the numerosity prerequisite to class certification is satisfied. *See* H. Newberg, 1 *Newberg on Class Actions* § 3.05 at 3–25 (3d ed.1992) (stating that "in light of prevailing precedent, the difficulty inherent in joining as few as 40 class members should raise a presumption that joinder is impracticable, and the plaintiff whose class is that large or larger should meet the test of Rule 23(a)(1) on that fact alone"). The court finds that the joinder of that many individuals in various geographic areas clearly would be impracticable. Thus, Rule 23(a)(1)'s numerosity requirement is satisfied.

### 2. Commonality

The next prerequisite for class certification is that there be "questions of law or fact common to the class." Fed.R.Civ.P. 23(a)(2). Not every question of law or fact need be common to every member of the class: "[i]ndeed, a single common question is sufficient to satisfy Rule 23(a)(2)." *In re Bone Screw,* 176 F.R.D. at 173 (citations omitted).

Here, the common question is whether Medicare beneficiaries who obtain recovery from the settlement of tort litigation are obliged to repay the amounts that the Government paid for conditions related to that recovery under the MSP. This central issue is common to all class members. The court finds that the existence of this common legal question satisfies the commonality requirement of Rule 23(a)(2).

### 3. Typicality

The third prerequisite to Rule 23(a)(3) class certification requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed.R.Civ.P. 23(a)(3). Claims qualify as typical where "litigation of the named plaintiffs' personal claims can reasonably be expected to advance the interests of absent class members." *In re Bone Screw,* 176 F.R.D. at 175 (citation omitted). Typicality derives from a strong similarity of legal theories and is present where the class representative's claims and those of the class members arise from the same alleged course of conduct by the defendant. *In re Prudential Ins. Co. of Am. Sales Practices Litig.,* 148 F.3d 283, 311 (3d Cir.1998), *cert. denied,* 525 U.S. 1114, 119 S.Ct. 890, 142 L.Ed.2d 789 (1999).

In the proposed class before the court, the legal theory is typical of the entire class and the same Government conduct is at issue. The Government sent substantially identical letters to approximately 1,800 Medicare beneficiaries in the AcroMed Settlement Class. These letters demand repayment for amounts that Medicare allegedly furnished in relation to the injuries that were the subject of the tort claims against AcroMed. The letters contend that the MSP authorizes the Government to recover Medicare costs from the proceeds of a tort settlement. Thus, the court concludes that there is an identity of interest of all class members and that Rule 23(a)(3)'s typicality requirement is satisfied.

### 4. Adequacy of Representation

Rule 23(a)'s final prerequisite is that "the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). The question of adequacy of representation has two components. "First, the adequacy of representation inquiry tests the qualifications of the counsel to represent the class. Second, it serves to uncover conflicts of interest between named parties and the class they seek to represent." *In re Prudential,* 148 F.3d at 312 (citations and internal quotations omitted). The court

5. The Government has expressed an intention to send additional letters.

finds that both class counsel and the named plaintiffs satisfy these tests.

With respect to class counsel, the Government does not challenge the qualifications of counsel to represent the class. (Fed. Defs.' Opp'n to Pl.'s Am.Mot. for Class Cert. at 10 n. 9.) Further, the court has previously determined that plaintiffs' counsel are highly competent and experienced class action attorneys who have pursued the interests of the class vigorously. *In re Bone Screw,* 176 F.R.D. at 176.

■ With respect to the class representative, the Government asserts that Fanning does not adequately represent the class as he "seeks to deny" and "purports to ... abandon all waiver and appeal rights for every putative class member who received a demand letter from HCFA." (Federal Defs.' Opp'n to Pl.'s Mot. for Class Certification at 13–14.) However, as stated at the hearing, class members' waiver rights are adequately preserved. The Government also contends that Fanning does not adequately represent the class because Medicare's reimbursement demand against him, totaling $8.71, is "de minimus." (Federal Defs.' Opp'n to Pl.'s Am. Mot. for Class Cert. at 12.) However, as the Government recognizes, the size of a representative plaintiff's claim "is not determinative as to whether the plaintiff will fairly and adequately protect the interests of the class." *Denny v. Carey,* 73 F.R.D. 654, 657 (E.D.Pa. 1977) (citations omitted). The court finds that the interest of the named plaintiff is sufficiently aligned with those of the absentees and that there are no disparate interests to impair Fanning's incentive to prosecute fully all aspects of the claim against the Government.

### 5. Rule 23(b)(2)

Under Rule 23(b)(2), class certification is appropriate where "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief with respect to the class as a whole." Fed. R.Civ.P. 23(b)(2).

■ Here, class members seek an injunction because the Government has sent virtu-

ally identical letters to Medicare beneficiaries, demanding immediate payment. The Government bases its identical action against class members upon its assertion that the MSP authorizes it to recover the costs of medical care from the proceeds of the tort litigation.

Thus, the court finds not only that Rule 23(a)'s requirements are met but also that the suit fits within the requirements of Rule 23(b)(2). Accordingly, it will certify a class on behalf of:

All persons who are members of the AcroMed Settlement Class (as defined in Pretrial Order 1117 entered in MDL 1014) and who, as a result of the Class Action Settlement Agreement with AcroMed Corporation, are subject to any Medicare-related claim, brought pursuant to the Medicare Secondary Payer statute, 42 U.S.C. § 1395y, or otherwise, by any of the defendants herein, except nominal defendants Robert E. Welsh, Jr. and PNC Bank, N.A., for reimbursement of the cost of medical care allegedly paid for or provided to them by any such defendant.

### B. *Preliminary Injunction*

Fanning next seeks an injunction to enjoin the Government from attempting recovery from class members for amounts Medicare allegedly furnished in relation to injuries that were the subject of the tort claims against AcroMed.

■ To obtain a preliminary injunction, the moving party must show both: the likelihood of irreparable harm without the relief sought; and a reasonable likelihood of ultimate success on the merits. *See Adams v. Freedom Forge Corp.,* 204 F.3d 475, 484 (3d Cir.2000) (setting forth standard for preliminary injunctive relief). The court also considers the likelihood of irreparable harm to the non-moving party and whether equitable relief will serve the public interest. *Id.*

### 1. Irreparable Harm and the Public Interest

■ In considering whether to grant a preliminary injunction, the court first considers the likelihood of irreparable harm with-

out the relief sought. "The irreparable harm requirement is met if a plaintiff demonstrates a significant risk that he or she will experience harm that cannot adequately be compensated after the fact by monetary damages." *Adams*, 204 F.3d at 484.

 Pursuant to the demand letters, when a class member does not or cannot pay Medicare the amount the Government demands by July 9, 2001, Medicare may recover the amount from any Social Security or Railroad Retirement benefits to which the class member would otherwise be entitled. (Am.Compl.Ex. B. at 2.) The money may also be recouped from payments to the class member that Medicare would otherwise have made. *Id.* Finally, interest on the class member's debt will accrue at a rate of 13.75% until it is paid, and Medicare will refer delinquent debts to the Department of the Treasury for offset against Federal payments that may be due or for other collection actions. *Id.*

Although the loss of income alone may not necessarily constitute irreparable harm, in this case, class members would suffer far more than mere economic loss. The statutory scheme at issue in this case was enacted to benefit the aged and the disabled. Class members generally receive Medicare and Social Security benefits and cannot work because they have been disabled by spinal disorders unsuccessfully treated with spinal fixation devices. Thus, they are dependant on Medicare and Social Security to provide ongoing medical care in addition to basic necessities.[6] Pursuant to the demand letters, Medicare may recover the amount demanded from Social Security or Railroad Retirement benefits to which the class member would otherwise be entitled, and may recoup the amount from payments that Medicare would otherwise make. No compensatory or other corrective relief at a later date will ad-

equately redress such potential harm. Accordingly, the court finds that the Government's demands threaten to inflict far more than mere economic loss and that the class members have established the likelihood of irreparable harm.

 The court next considers the likelihood of irreparable harm to the non-moving party. The Government asserts that granting an injunction would interfere with the Secretary of Health and Human Service's [7] delegated responsibilities to make decisions regarding the amounts of benefits payable on a beneficiary's behalf. (Federal Defs.' Opp'n to Pl.'s Mot. for Class Cert. at 35–36.) It also contends that the public has a strong interest in ensuring that Medicare monies are reimbursed. *Id.*

The court finds that the Government's asserted interests do not weigh strongly against an injunction. The Government makes no attempt to support its vague, generalized allegation of irreparable harm. Certainly, it has an interest in maintaining the integrity of the Medicare program, and it is not contested that the MSP was designed to further the public interest by facilitating the recoupment of certain Medicare expenditures for items or services that Congress has decided are more appropriately paid for by certain other persons or entities. Nonetheless, the court fails to see how enjoining the Government from demanding amounts that class members received under the AcroMed Settlement Agreement would interfere with the operation of the Medicare program.

Lastly, the court finds that the public has a significant interest in the efficient resolution of this mass tort litigation. Significant public funds have been expended by virtue of the court's administration of this litigation. Further delay in the distribution of settlement proceeds will not only cast doubt on the viability of the judicial system for efficiently

---

6. The court notes that, in addition to the testimony heard from individual class members who attended the June 6, 2001 hearing, it has received numerous phone calls from class members calling to express their concerns regarding the Government's actions in this matter.

7. Medicare is administered by the Health Care Financing Administration (the "HCFA"), on be-

half of the Secretary of the Department of Health and Human Services (the "Secretary"), who is ultimately responsible for the administration of Medicare. 42 U.S.C. § 1395kk(a); *Universal Health Servs. of McAllen, Inc. v. Sullivan*, 770 F.Supp. 704, 707 (D.D.C.1991), *aff'd*, 978 F.2d 745 (D.C.Cir.1992).

resolving mass tort litigation, but also cause immediate and irreparable injury to the class. Thus, the court finds that equitable relief will serve the public interest.

## 2. Likelihood of Success on the Merits

The Government's assertion that it is entitled to reimbursement from the AcroMed Settlement Fund and/or from Settlement beneficiaries, for amounts that the Government paid to those beneficiaries for conditions related to their settled claims, is based on the MSP, 42 U.S.C. § 1395y.

The MSP consists of a series of amendments to Medicare that grant the Government a statutory right to recover certain Medicare expenditures, creating a direct cause of action in favor of the Government that is enforceable through judicial action. *In re Diet Drugs Prods. Liab. Litig.*, No. 99–20593, 2001 WL 283163, at *9 (E.D.Pa. Mar. 21, 2001) (citing *Health Ins. Ass'n of Am. v. Shalala*, 23 F.3d 412, 425 (D.C.Cir.1994)).[8] The statute makes Medicare a "secondary" payer where another entity, a "primary payer" is required to pay under a "primary plan" for an individual's healthcare. 42 U.S.C. § 1395y(b)(2); *In re Diet Drugs*, 2001 WL 283163, at *9; *United States v. Philip Morris, Inc.*, 116 F.Supp.2d 131, 145 (D.D.C. 2000). If the Government, as secondary payer, makes a payment for which a primary plan is responsible, the payment is conditioned on reimbursement from the primary payer. 42 U.S.C. § 1395y(b)(2)(B)(i). The MSP grants the Government a cause of action against the primary payer, or any person who has received payment therefrom, for reimbursement of those payments or double damages.[9] *Id.* § 1395y(b)(2)(B)(ii).

The MSP defines a "primary plan" as "a group health plan or large group health plan,

... a workman's compensation law or plan, an automobile or liability insurance policy or plan (including a self-insured plan) or no fault insurance ..." under which payment for medical care "has been made or can reasonably be expected to be made promptly." 42 U.S.C. § 1395y(b)(2)(A); *In re Diet Drugs*, 2001 WL 283163, at *9. "Promptly" is defined as "payment within 120 days after receipt of the claim." 42 C.F.R. § 411.21.

The Government states that it is entitled to recover payments made to Medicare beneficiaries who are also members of the AcroMed Settlement Class because AcroMed is a "self-insurer" obligated to reimburse the Government for Medicare expenditures by the plain terms of the MSP. According to the Government, an entity that enters a liability settlement for alleged tortious conduct and funds that settlement with its own assets or borrowings is a "self-insured plan" that qualifies as a "primary plan." Further, the Government asserts that the situations in which the MSP makes Medicare a secondary payer entitled to reimbursement are not limited to payments for items or services for which another party has made prompt payment or can reasonably be expected to pay promptly. Lastly, the Government argues that its interpretation of the MSP is entitled to deference under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

The Government's argument fails as a matter of law because: the term "self-insurer" as used in the MSP was not meant to encompass alleged tortfeasors who merely fund liability settlements with their own assets or corporate borrowings; and the MSP makes a Government payment conditional, and thus subject to reimbursement, only where the

---

8. The court hereby incorporates by reference its reasoning *In re Diet Drugs Prods. Liab. Litig.*, No. 99–20593, 2001 WL 283163 (E.D.Pa. Mar. 21, 2001), which discusses the MSP.

9. Specifically, the MSP states that:
[i]n order to recover payment under this subchapter for such an item or service, the United States may bring an action against any entity which is required or responsible ... to make payment with respect to such item or service ... under a primary plan (and may ... collect double damages against that entity), or against

any other entity (including any physician or provider) that has received payment from that entity with respect to the item or service, and may join or intervene in any action related to the events that gave rise to the need for the item or service....
42 U.S.C. § 1395y(b)(2)(B)(ii). The MSP further provides that the Government "shall be subrogated ... to any right under this subsection of an individual or any other entity to payment with respect to such item or service under a primary plan." *Id.* § 1395y(b)(2)(B)(iii).

insurance entity has made prompt payment or can reasonably be expected to make prompt payment for costs related to the federal beneficiary's medical treatment.

The court will first address whether the Government's interpretation of the MSP is entitled to deference under *Chevron*, and then address the parties' arguments regarding whether the AcroMed Settlement Trust or AcroMed itself is a "self-insured plan" qualifying as a "primary plan" obligated by the MSP to reimburse the Government.

### a. *Whether Deference is Due*

 As an initial matter, contrary to the Government's contention, its interpretation of the MSP is not entitled to deference under *Chevron*. *See Chevron*, 467 U.S. at 844–45, 104 S.Ct. 2778 (holding that court must give effect to agency *regulation* containing a reasonable interpretation of ambiguous statute). Agency opinions that are not arrived at after a formal adjudication, notice-and-comment rulemaking, or otherwise in the exercise of congressionally delegated rulemaking authority—such as interpretations in the instant demand letters, as well as interpretations in legal briefs, opinion letters, policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant deference under *Chevron*. *See, e.g., United States v. Mead Corp.,* —— U.S. ——, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) (holding that tariff classification rulings in individual cases by United States Customs Service are not entitled to *Chevron* deference) [10]; *Christensen v. Harris County,* 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000) (holding that interpretation in opinion letter not entitled to deference) (citations omitted); *Martin v. Occupational Safety and Health Review Comm'n,* 499 U.S. 144, 157, 111 S.Ct. 1171, 113 L.Ed.2d 117 (1991) (stating that interpretative rules and enforcement guidelines are

"not entitled to the same deference as norms that derive from the exercise of ... delegated lawmaking powers"); *Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 212–213, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988) (exhibiting Court's near indifference to interpretation advanced for first time in litigation brief). Rather, such interpretations are entitled to respect only to the extent that they have the power to persuade. *Mead Corp.,* —— U.S. ——, 121 S.Ct. 2164, 150 L.Ed.2d 292 (citing *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944)); *Christensen,* 529 U.S. at 587, 120 S.Ct. 1655. For the reasons set forth below, the court finds the Government's interpretation of the MSP entirely unpersuasive. *See In re Dow Corning Corp.,* 250 B.R. 298, 336 n. 21 (Bankr. E.D.Mich.2000) (stating that Government's statutory construction is "entirely unsupported by the statute" and appears to be intended to convert MSP from sensible fiscal cost-cutting measure into heavy-handed collection tool).

### b. *"Self–Insured Plan" Under the MSP*

The Government notes that under the Health Care Financing Administration's ("HCFA") regulations, a " 'self-insured plan' ... 'means a plan under which an individual, or a private or governmental entity, carries its own risk instead of taking out insurance with a carrier.' " *See* Federal Defs.' Opp'n to Pl.'s Mot. for T.R.O. and/or Prelim. Inj. ("Opp'n to Mot. for T.R.O.") at 28 (quoting 42 C.F.R. § 411.50(b)). It further points out that a "self-insured plan" includes an "entity engaged in a business, trade or profession." *Id.* (quoting 42 C.F.R. § 411.50(b)). HCFA regulations define a "plan" as "any arrangement, oral or written, by one or more entities, to provide health benefits or medical care or assume legal liability for injury or illness." 42 C.F.R. § 411.21.

10. *Mead Corp.* was decided twelve days after the June 6, 2001 hearing regarding the instant motions. The parties have not submitted supplemental papers addressing the decision, and the deference issue has not been extensively briefed or argued by any of the parties.

There is no indication here that the Government's interpretation was arrived at through HCFA's congressionally delegated rulemaking authority. *See, e.g., Mead Corp.,* —— U.S. ——, 121 S.Ct. 2164, 150 L.Ed.2d 292 (concluding that no deference was due to U.S. Customs Service's tariff classification rulings where there was no indication that agency "ever set out with lawmaking pretense in mind" when it made such rulings). Even if it had been and deference was due, the Government's interpretation is clearly unsupportable for the reasons discussed *infra*.

From these provisions, the Government concludes that an entity that enters a liability insurance settlement, i.e., an arrangement in which an entity that has chosen to carry its own risk agrees to assume legal liability for injury or illness, is a self-insured plan under the MSP. (Opp'n to Mot. for T.R.O. at 29–30.) For the following reasons, however, the Government cannot establish that AcroMed or the AcroMed Settlement Fund are "self-insured plans" as defined by the MSP.

First, the HCFA itself, the entity charged with administering Medicare and that promulgated the regulations to which the Government cites, has indicated that:

the mere absence of insurance purchased from a carrier does not necessarily constitute a 'plan' of self-insurance. If . . . the absence of insurance purchased from a carrier does not constitute a 'self-insured plan' in a particular case, HCFA will not attempt to recover its payments from the entity that lacks insurance coverage.

54 Fed.Reg. 41727 (Oct. 11, 1989) (responding to comment that regulations should clarify whether Medicare is primary payer when presumed tortfeasor has no liability insurance). Thus, the scope of entities that fall within the definition of a "self-insured plan" clearly does not encompass all entities that make payments, independent of any liability insurance coverage, potentially related to conditions for which Medicare has made payment.

Second, there is simply no basis to conclude that Congress intended the MSP to create in the Government a right to recover from alleged tortfeasors for injuries resulting in Medicare payments. *In re Diet Drugs*, 2001 WL 283163, at *10. Unlike the MCRA, the MSP does not mention a right by the Government to recover from a tortfeasor. *Id.* Rather, the express wording of the statute creates a cause of action only against insurers and their payees. *Id.; see United States v. Rhode Island Insurers' Insolvency Fund*, 80 F.3d 616, 622 n. 5 (1st Cir.1996) (stating that MSP "limits reimbursement to recoveries from 'primary plans,' whose definition lists only entities which are clearly 'within' the insurance industry"); *Philip Morris,*

*Inc.*, 116 F.Supp.2d at 146 & n. 22 (dismissing MSP claim against defendants who clearly were not insurance entities and noting that courts have uniformly recognized that statute's clear purpose was to grant Government right to recover Medicare costs from insurers) (citations omitted); *Dow Corning*, 250 B.R. at 337 n. 22 (stating that unless alleged tortfeasor qualifies as primary plan or received payment from primary plan, MSP does not grant right to initiate direct action against it); *see also Health Ins. Ass'n*, 23 F.3d at 427 n. * (stating that MSP "plainly intends to allow recovery only from an insurer") (Henderson, J., concurring). Under the Government's construction of the statute, every tortfeasor that used its general assets to fund a tort settlement with persons who had received federal health care benefits would be potentially liable under the MSP. *In re Diet Drugs*, 2001 WL 283163, at *10. There is absolutely no legal support for this extremely broad construction of the statute. *Id.* The court's conclusion is bolstered by the fact that up until the recent *Philip Morris* and *Dow Corning* cases, the case law is devoid of any instances in which the Government attempted to sue a tortfeasor under the MSP, despite the fact that the statute had been in existence for twenty years. *Philip Morris*, 116 F.Supp.2d at 146 n. 22. As noted by this court in *In re Diet Drugs* and by Judge Kessler in *Philip Morris*, " 'it is clear that Congress did not intend MSP to be used as an across the board procedural vehicle for suing tortfeasors.' " *In re Diet Drugs*, 2001 WL 283163, at *10 (quoting *Philip Morris*, 116 F.Supp.2d at 135).

Lastly, the Government asserts that HCFA's regulation in 42 C.F.R. § 411–50(b) clarifies that the Government has an MSP claim with respect to monies paid by a tortfeasor. That provision states in relevant part that a "[l]iability insurance payment" subject to the MSP "means a payment by a liability insurer, or an out-of-pocket payment, including a payment to cover a deductible required by a liability insurance policy, by an individual or other entity that carries liability insurance, or is covered by a self-insured plan." 42 C.F.R. § 411.50(b). The Government's argument, however, fails to account

for the repeated use of the word "plan" throughout the MSP and regulations promulgated thereunder, including the regulation it cites. *See* 42 C.F.R. § 411.50(b) (defining self-insured plan as "plan" under which entity carries its own risk, including "plan" of business entity).

The plain meaning of the term "self-insured plan" and the statutory context in which that term is used indicate that it does not include tortfeasors that merely have the ability to, and do in fact, fund a settlement of a tort suit with general assets of the company or corporate borrowings. *In re Diet Drugs*, 2001 WL 283163, at *10. The statute's requirement of the existence of a primary "plan" connotes some type of formal arrangement by which an entity consciously undertakes to set aside funds to cover potential future liabilities and a formal procedure for processing claims made against that fund pursuant to the terms of the "plan." *In re Diet Drugs*, 2001 WL 283163, at *10; *see Moore v. Warehouse Club, Inc.*, 992 F.2d 27, 29 (3d Cir.1993) (stating that, as a matter of statutory construction, words "will be interpreted as taking their ordinary, contemporary, common meaning"). For example, a leading treatise on the subject of insurance states that:

> ... to meet the conceptual definition of self-insurance, an entity would have to engage in the same sorts of underwriting procedures that insurance companies employ; estimating likely losses during the period, setting up a mechanism for creating sufficient reserves to meet those losses as they occur, and, usually, arranging for commercial insurance for losses in excess of some stated amount.

1 Couch on Insurance 10:1 (citing, as an example, IBM's historical self-insurance of employee health benefits); *see Alderson v. Ins. Co. of N. Am.*, 223 Cal.App.3d 397, 407,

273 Cal.Rptr. 7 (1990) (noting that it is implicit in term "self-insurer" that such entity maintains reserve, to cover possible losses, from which it pays out valid claims and that self-insurer has procedure for considering such claims and managing reserve); *see also In re Diet Drugs*, 2001 WL 283163, at *10–11 (concluding that settlement trust funded by alleged tortfeasor's own funds does not constitute "self-insured plan" for purposes of MSP) (citations omitted); *Dow Corning*, 250 B.R. at 339 (stating that "[w]e are dubious that the term 'self-insured plan' covers or was meant to cover every tortfeasor who fails to obtain insurance") (citations omitted). HCFA's definitions of a "self-insurer" and a "plan" are not to the contrary. 42 C.F.R. §§ 411.21 & 411.50(b). Thus, it is doubtful that the Government can maintain a cause of action against AcroMed, the AcroMed Settlement Fund or class members simply by virtue of the fact that AcroMed funded the Settlement with its own funds or corporate borrowings rather than those of a liability insurer. Furthermore, the Government has proffered no evidence, and has not even alleged, that AcroMed maintains such a formal plan of self-insurance in order to cover possible losses.

■ Given the plain language of the MSP, its legislative history, the case law interpreting it and the absence of any reported decision in which the Government has prevailed under MSP against an entity that was clearly outside of the insurance industry, the court concludes that the Government's MSP cause of action arises when the "primary plan" is obligated to pay for the primary care at issue under a contract of insurance or other formal insurer-insured relationship, not when the payment obligation arises out of tort litigation.[11] *See In re Diet Drugs*, 2001 WL 283163, at *11 (agreeing that double penalties might be appropriate

---

11. When pursuing MSP reimbursement in the context of a formal plan of self-insurance, the Government could point to the terms of the plan to support its demand for reimbursement, regardless of whether or not the federal beneficiary made a claim against the plan. However, in the context of an alleged tortfeasor, if the Government's interpretation of the MSP was correct, its right to seek reimbursement would presumably be contingent on whether the federal beneficiary filed suit and prevailed against or settled with that tortfeasor. The court finds it bizarre and unlikely that Congress could have intended that the Government's right of recovery would be contingent on the federal beneficiary's decision of whether to seek reimbursement and the additional contingency of a judgment or settlement involving money for injuries for which the plaintiff received Medicare payments.

against insurer who fails to honor contractual obligation to pay, but not against tortfeasor). To read the statute otherwise would lead to the conclusion that Congress authorized double damages against alleged tortfeasors merely for contesting liability.[12] *Id.* When the full history of the instant topic is considered, it becomes eminently clear that Congress could not have intended, and indeed did not intend, such a result. *See id.* (reaching identical conclusion).

### c. *MSP's "Prompt Payment" Requirement*

■ Even if the AcroMed Settlement Trust fell within the general meaning of a "self-insured plan," it does not qualify as a "primary plan" obligated by the MSP to reimburse the Government for Medicare expenditures because it is not a "self-insured plan" under which payment for medical care "has been made or can reasonably be expected to be made promptly." 42 U.S.C. § 1395y(b)(2)(A).

■ As already explained by this court's opinion in *In re Diet Drugs* and the exhaustively thorough and well reasoned opinion in *Dow Corning*, § 1395y(b)(2)(A) of the MSP defines a "primary plan" as including a liability insurance policy or plan, including a self-insured plan, "to the extent that" payment for health care "can reasonably be expected to be made promptly" under that policy. *See* 42 U.S.C. § 1395y(b)(2)(A) (stating that "primary plan" means "liability insurance policy . . . to the extent that" § 1395y(b)(2)(A)(ii), encompassing plans that can reasonably be expected to make prompt payment, applies); *In re Diet Drugs*, 2001 WL 283163, at *11 n. 20 (concluding that MSP applies to "primary plan" under which payment for medical care "has been made or can reasonably be expected to be made promptly"); *Dow Corning*, 250

B.R. at 348 n. 29 (same). Thus, if a liability insurance policy has not made prompt payment and cannot reasonably be expected to pay promptly for the health care at issue, it is not a "primary plan." *In re Diet Drugs*, 2001 WL 283163, at *11 n. 20 (citing *Dow Corning*, 250 B.R. at 348 n. 29 and *Health Ins. Ass'n*, 23 F.3d at 419).

Under the MSP, a Medicare payment is only conditional, and the Government only becomes a "secondary payer," if that payment is for an item or service to which § 1395y(b)(2)(A) applies. 42 U.S.C. § 1395y(b)(2)(B)(i). Therefore, when Medicare pays for health care to which § 1395y(b)(2)(A) does not apply—for example, payment for an item or service that the Government cannot reasonably expect to be paid for promptly under the terms of the insurance plan—the Medicare payment is not conditional and the Government does not acquire secondary payer status with respect to that payment or the corresponding authority to initiate a recovery action under § 1395y(b)(2)(B)(ii).[13] *In re Diet Drugs*, 2001 WL 283163, at *11 n. 20; *Dow Corning*, 250 B.R. at 346 n. 29.

HCFA regulations state that a payment is made "promptly" if made within 120 days after the earlier of the date the care was provided or the date a claim is filed with the insurer. 42 C.F.R. §§ 411.21, 411.50. Given the time delay inherent in strongly prosecuted and defended tort litigation, the Government cannot legitimately assert that a settlement arrived at in the heat of a hard fought adversarial engagement for alleged tort liability from a defective product is the type of insurance "plan" that the Government can reasonably expect to make prompt payment for medical care.[14] *In re Diet Drugs*, 2001

---

**12.** In entering the Settlement Agreement, AcroMed did not admit or concede liability and the Agreement expressly states that it shall not be construed as an admission or concession of liability. (P–1 at § II.C.)

**13.** For these reasons, the statement in *Philip Morris* that "[i]f the 'primary' payer has an obligation to pay for such costs, but does not and cannot 'reasonably be expected' to do so, Medicare may make a 'conditional payment' and later demand reimbursement from the primary plan" is too broad. *Philip Morris*, 116 F.Supp.2d at

145. It is the obligation to make prompt payment "under" the plan that makes an entity a "primary" payer and the Government the "secondary" payer. *In re Diet Drugs*, 2001 WL 283163, at *11 n. 20. The court notes, as it did in *In re Diet Drugs*, that this issue was not germane to Judge Kessler's otherwise thorough and well-reasoned decision. *Id.*

**14.** It should be noted that the other types of insurance included in the definition of a "primary payer" under § 1395y(b)(2)(A), i.e., workmen's compensation, automobile and no fault

WL 283163, at *11 n. 20; *see, e.g., Evanston v. Hauck*, 1 F.3d 540, 544 (7th Cir.1993) (stating that tort judgment "can in no sense be considered the kind of certain, prompt third-party payment Congress had in mind when it wrote the Medicare statute"); *Dow Corning*, 250 B.R. at 348 n. 29 (noting that it would seem folly for Government to argue that when it made Medicare payments on behalf of breast implant recipients, there was reasonable expectation that third-party would promptly pay for such care). Further, because the AcroMed Settlement was not even in existence at the time that the Government made the payments at issue, it is clearly not a "plan" that was required to make "prompt" payment, i.e., payment within 120 days, for the relevant medical expenses. 42 U.S.C. § 1395y(b)(2)(A); 42 C.F.R. §§ 411.21, 411.50.

Despite the explicit terms of the MSP, the case law interpreting it and the complete inability to cite any contrary authority on point, the Government contends that the foregoing interpretation of the MSP "turns the statute on its head by limiting HCFA's right to reimbursement to situations in which payment is expected to be made promptly." However, as noted above, § 1395y(b)(2)(B)(i) limits the Government's reimbursement remedy to any payment falling under § 1395y(b)(2)(A), which applies only to payments with respect to an item or service to the extent that payment has been or can reasonably be expected to be made promptly under a self-insured plan. Thus, the statute by its terms limits the Government's right to reimbursement to situations in which prompt payment has been made or can reasonably be expected by a "primary plan." Any other interpretation flies in the face of the MSP's explicit terms.

The Government's contention that Fanning's interpretation "would give the United States a right to recover only conditional payments that it is not permitted to make in the first place" is wrong. At 42 U.S.C. § 1395y(b)(2)(A), the MSP prohibits the Government from making payments "*except as provided in subparagraph (B)*" to the extent that another entity is reasonably expected to pay promptly for such items or services. (Emphasis added.) Subparagraph (B) then provides that the Government's payment is conditional when it makes a payment for items or services for which another entity is reasonably expected to pay promptly. 42 U.S.C. § 1395y(b)(2)(B)(i) (making payment covered by § 1395y(b)(2)(A) conditional). Thus, the statute expressly permits the Government to make payment for items or services for which another entity is required to pay promptly, but makes such payments subject to the Government's right to reimbursement through the cause of action created in § 1395y(b)(2)(B)(i).

This interpretation is entirely consistent with the court's conclusion that the Government's MSP cause of action arises when the "primary plan" is obligated to pay for the primary care at issue under a contract or other formal plan of insurance, not when the payment obligation arises out of tort litigation. Given this logical definition of a "primary plan," the Government's argument that the court's interpretation would allow any liability insurance policy or plan to "escape liability entirely by disputing a claim or otherwise failing to make payments in a prompt fashion" is clearly without merit. If it was later determined that the terms of the policy or plan obligated the relevant entity to make prompt payment for medical care related to the conditions at issue, then that entity is one that could reasonably have been expected to make prompt payment, entitling the Government to reimbursement should it make a conditional payment. Whether or not the insuring entity contested liability would be irrelevant to whether it was obligated, and therefore was reasonably expected, to make prompt payment under the terms of the plan, and the Government's right to initiate suit for reimbursement "when notice ... is received that payment for such item or service has been ... made" would remain intact. 42 U.S.C. § 1395y(b)(2)(B)(i). Thus, contrary to the Government's contention, the court's interpretation in no way minimizes a private

insurance, are frequently required by the terms of the policy itself to make prompt payment for medical expenses. *See, e.g.,* 47 Fed.Reg. 21103

(stating that "under automobile medical or no fault insurance, payment can frequently be foreseen with reasonable certainty").

insurer's financial obligation to its insured. *See* Opp'n to Pls.' Mot. For T.R.O. at 31 (citing *United States v. Geier*, 816 F.Supp. 1332, 1336 (W.D.Wis.1993), which indicates that Congress did not intend MSP to minimize insurer's obligation to insured).

Lastly, if the court were to accept the Government's interpretation of the MSP, as discussed above, all entities possessing or borrowing sufficient funds to cover tort liabilities would be liable for double damages if they entered a settlement or received an adverse judgment more than 120 days after the suit was filed or a claim was otherwise formally prosecuted. *See* 42 U.S.C. § 1395y(b)(2)(B)(ii) (permitting Government to sue for double damages against entity that is required or responsible to pay for item or service covered by MSP). Obviously, this situation presents itself in the overwhelming majority of tort lawsuits. It is implausible that Congress intended such a result, and even if it had, the court doubts whether the MSP's application in this manner would withstand constitutional scrutiny. The Government fails to address this flaw in its interpretation.

Thus, even if AcroMed or the AcroMed Settlement Fund fall within the definition of "self-insured plan" under the MSP, neither is a "primary payer" against which the Government can seek reimbursement because neither could reasonably be expected to make prompt payment for medical costs. 42 U.S.C. § 1395y(b)(2)(A).

For all of these reasons, the court concludes that the class members have demonstrated that they are likely to ultimately prevail on the merits of the Government's MSP claim.

### C. *Motion to Dismiss*[15]

In its motion to dismiss, the Government first argues that the court must dismiss the Amended Complaint because the Medicare Act precludes jurisdiction and because the Government has not waived sovereign immunity. The Government next argues that the claims against those federal defendants who are not alleged to have taken any action against the class members must be dismissed.

As stated below, the court finds that the Medicare statutory scheme does not preclude judicial review in this case and that government immunity is waived under the Administrative Procedures Act, 5 U.S.C. § 702 *et seq.* ("APA"). Thus, the court has jurisdiction under 28 U.S.C. § 1331 (federal question) and will not dismiss the Amended Complaint for lack of jurisdiction. However, the court will grant the motion to dismiss insofar as the Amended Complaint fails to allege any action by certain federal defendants who are not alleged to have taken any action against the class members.

### 1. Jurisdiction

The Government first argues that the court lacks jurisdiction because 42 U.S.C. § 405(g) and (h), as incorporated by 42 U.S.C. § 1395ii, bar federal question jurisdiction where the class members have not exhausted their administrative remedies by pursuing administrative appeals under Section 405 of the Social Security Act.[16] Fan-

---

**15.** For the purposes of a motion to dismiss, the court must accept as true all well-pleaded allegations of fact in a plaintiff's complaint, construe the complaint in the light most favorable to the plaintiff, and determine whether "under any reasonable reading of the pleadings, the plaintiff may be entitled to relief." *Colburn v. Upper Darby Township*, 838 F.2d 663, 665–66 (3d Cir. 1988). The court, however, need not accept as true legal conclusions or unwarranted factual inferences. *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir.1997) (citations omitted). A complaint is properly dismissed only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v.*

*Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

**16.** Section 405 "spells out the procedures under which applications for social security benefits are adjudicated." *Ohio Hospital Ass'n v. Shalala*, 201 F.3d 418, 422 (6th Cir.1999). Under 42 U.S.C § 405(b), the Commissioner of Social Security is directed to make findings of fact and decisions as to the rights of any individuals applying for Social Security Benefits. Upon request, the Commissioner must afford a dissatisfied applicant an evidentiary hearing. *Id.* Once the Commissioner has issued a final decision after a hearing to which the individual was a party, § 405(g) provides that the individual "may obtain review of such decision by a civil action"

ning, however, contends that Congress did not channel review of the instant claim through 42 U.S.C. § 405(g) and (h).

The inquiry in determining whether federal question jurisdiction is barred is whether the plaintiff seeks "to recover on any claim arising under" the Medicare Act. 42 U.S.C. § 405(h); *Heckler v. Ringer*, 466 U.S. 602, 636, 104 S.Ct. 2013, 80 L.Ed.2d 622 (1984) (citing *Weinberger v. Salfi*, 422 U.S. 749, 760–61, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975)).

■ Here, plaintiffs do not seek "to recover" anything. They do not seek Medicare benefits or reimbursement for Medicare benefits. Nor may their claim be construed as a claim for benefits "in essence." *Ringer*, 466 U.S. at 623, 104 S.Ct. 2013. In this case, class members received benefits allegedly furnished by Medicare in relation to allegedly AcroMed-related injuries years ago. Rather than seeking "to recover on any claim arising under" the Medicare Act, class members seek an injunction to prevent the Government from undertaking action against them to obtain money that class members received or may receive under the terms of the Settlement Agreement with AcroMed.

Further, in support of its assertion that the court lacks jurisdiction because the class

members failed to exhaust administrative remedies, the Government cites only cases wherein plaintiffs sought to receive Medicare benefits either immediately or in the future, *Weinberger*, 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522, *Ringer*, 466 U.S. 602, 104 S.Ct. 2013, 80 L.Ed.2d 622, and cases concerning medical providers' eligibility for reimbursement, *Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1, 120 S.Ct. 1084, 146 L.Ed.2d 1 (2000). (Opp'n to Mot. for T.R.O. at 12–14; Govt.'s Mem. of Law in Supp. of Mot. to Dismiss Am.Compl. at 17–20.) None of these situations exist in the instant dispute.

Thus, the court finds that there is simply no basis from which it may conclude that the class members' challenge to the validity and constitutionality of HCFA's demand for payment should be channeled first into the administrative process Congress provided for determination of claims for benefits.[17] The court concludes that the Medicare statutory scheme does not preclude judicial review of the class members' claims.

Further, sovereign immunity does not apply. Judicial review to class members "suffering legal wrong[s] because of agency action, or adversely affected or aggrieved by

---

commenced in a United States District Court. In this statutory setting, § 405(h) provides:

> The findings and decision of the Commissioner of Social Security after a hearing shall be binding upon all individuals who were parties to such hearing. No findings of fact or decision of the Commissioner of Social Security shall be reviewed by any person, tribunal or governmental agency except as therein provided. No action against the United States, the Commissioner of Social Security, or any officer or employee thereof shall be brought under section 1331 or 1346 of Title 28 to recover on any claim arising under this subchapter.

**17.** Arguing that this is a case of overpayment of benefits, the Government cites *Buckner v. Heckler*, 804 F.2d 258 (4th Cir.1986), for the proposition that class members must exhaust administrative remedies before seeking relief in federal court. (Opp'n to Mot. for T.R.O. at 15 & 17.) That case, however, is inapposite. In *Buckner*, the plaintiff sued the Secretary seeking to recover an overpayment of medical benefits that resulted when both plaintiff's automobile insurer and the medicare program paid plaintiff's hospital expenses. *Id.* at 259. Buckner was admitted to the hospital following an automobile accident

on December 6, 1982, incurring $20,845.45 in medical expenses. *Id.* Medicare paid $20,636.66. *Id.* Then, on February 26, 1983, eighty-two days after the hospitalization, the plaintiff's automobile insurer paid $5,317.76. *Id.* Thus, the hospital received an overpayment of $5,108.97. *Id.* Buckner filed suit against the Secretary, arguing that she was entitled to the overpayment.

Unlike *Buckner*, no medical provider in the instant case was paid twice or received an overpayment for benefits provided. In *Buckner*, prompt payment, i.e., within 120 days, was made, and was "reasonably ... expected to be made" by the plaintiff's automobile insurance plan. 42 U.S.C. § 1395y(b)(2); *Buckner*, 804 F.2d at 259 & n. 3 (citing MSP). Because Buckner's automobile insurance was reasonably expected to make prompt payment, Medicare's payment was conditional under the MSP. *Id.* In the instant case, there was no primary plan reasonably expected to make prompt payment, thus Medicare's payment was not conditional. Finally, unlike *Buckner*, class members do not seek the payment of benefits. Rather, they seek to enjoin the Government from attempting to recover from class members payments previously made by Medicare on account of the AcroMed settlement.

agency action" is provided by the Administrative Procedures Act, 5 U.S.C. § 702 *et seq.* ("APA"). The APA authorizes judicial review of the actions of federal administrative agencies. The APA waives government immunity for: final agency actions; for which there is no adequate remedy at law; and for relief other than money damages.

 "Final" agency actions are those that impose an obligation, deny a right, or fix a legal relationship. *Hindes v. FDIC*, 137 F.3d 148, 162 (3d Cir.1998) (citing *Shea v. Office of Thrift Supervision*, 934 F.2d 41, 44 (3d Cir.1991)). To be "final," an decision must: 1) represent the agency's definitive position on the question; 2) have the status of law with the expectation of immediate compliance; 3) have an immediate impact on Plaintiffs' day-to-day operations; 4) involve a pure question of law; and 5) immediate review would speed enforcement. *Matter of Seidman*, 37 F.3d 911, 923 (3d Cir.1994) (citing *CEC Energy Co., Inc. v. Public Serv. Comm.*, 891 F.2d 1107, 1110 (3d Cir.1989)).

 Here, HCFA's demand letters represent the agency's definitive position that under its interpretation of the MSP, the Government is entitled to reimbursement for medical expenses because of the AcroMed Settlement. The demand letters impose an obligation with the expectation of immediate compliance by July 9, 2001, or interest will accrue at a rate of 13.75%. The impact of the Government's demand is immediate, as evidenced by testimony at the hearing and the phone calls from class members the court received in chambers, and the issue involves a pure question of law. Thus, the court finds that the agency action is clearly "final" under the APA.

The court also concludes, as discussed *supra*, that there is no adequate remedy at law. Although the Government asserts that Medicare beneficiaries must exhaust administrative appeals procedures or seek waivers, it cites only regulations regarding the overpayment of benefits to medical providers and to regulations regarding conditional payments, which are not applicable for the reasons already discussed. Finally, Fanning seeks relief other than money damages, namely, an injunction. Thus, the court concludes that

judicial review is authorized by the Administrative Procedures Act.

### 2. Defendants Not Alleged to Have Taken Action Against Class Members

In its motion to dismiss, the Government also seeks to dismiss the Amended Complaint's MCRA claims. As stated *supra*, the demand letters base the Government's demand for reimbursement entirely on the MSP. (Am.Compl.Ex.B.) The Government acknowledged at the June 6, 2001 hearing that it has not sought to justify its demands for reimbursement from class members under the MCRA, which grants the Government a right to recover from tortfeasors, but does not provide a cause of action to recover Medicare expenses or allow the Government to collect from an injured person or from a settlement fund negotiated between the injured person and the settling defendant. 42 U.S.C. § 2651(a); *In re Diet Drugs*, 2001 WL 283163, at *8 (citations omitted). Thus, insofar as the Amended Complaint asserts a claim under the MCRA, the court will grant the Government's motion to dismiss said claim.

In this regard, twelve of the seventeen named defendants do not have any relationship to the MSP or the Medicare program, including: the United States Department of Defense; the United States Department of the Army; the United States Department of the Navy; the United States Department of the Air Force; the United States Indian Health Service; the United States Department of Veterans Affairs; Donald H. Rumsfeld, in his capacity as Secretary of the United States Department of Defense; Joseph W. Westphal, in his capacity as Acting Secretary of the United States Department of the Army; Robert B. Pirie, Jr., in his capacity as Acting Secretary of the United States Department of the Navy; Lawrence Delaney, in his capacity as Acting Secretary of the United States Department of the Air Force; Michael H. Trujillo, in his capacity as Director of the United States Indian Health Service; and Anthony J. Principi, in his capacity as the Secretary of the United States Department of Veterans Affairs. Thus, the court

will grant the Government's motion to dismiss class member's claims against these defendants.

Accordingly, for purposes of this Memorandum and Order, the remaining "Federal Defendants" include: 1) the United States of America ("United States"); 2) the United States Health Care Financing Administration ("HCFA"); 3) the United States Department of Health and Human Services; 4) Tommy G. Thompson, in his capacity as Secretary of the United States Department of Health and Human Services; and 5) Thomas Scully, in his capacity as Administrator of HCFA, an Agency of the Department of Health and Human Services.

### D. *Distribution of the Settlement Proceeds*

As to Plaintiffs' motion in *Fanning I* to require distribution of the settlement proceeds without regard to the Government's interest, the court notes that the Government expressed no objection to distribution. Further, although AcroMed initially objected in a filing dated March 27, 2001, during the June 6, 2001 hearing on the matter, AcroMed voiced no objection to distributing the settlement proceeds.[18] Nevertheless, out of an exercise of extreme caution, the court will direct a reserve of $1,000,000.00 to be set-aside. The court concludes that this sum will adequately protect any interest in the settlement proceeds that the Government may ultimately establish.

### III. *CONCLUSION*

For the reasons set forth above, the motions for class certification and for a preliminary injunction will be granted; the Government's motion to dismiss will be granted in part and denied in part; and the motion to

require distribution of the settlement proceeds will be granted.

An appropriate Order follows.

### ORDER

AND NOW, TO WIT, this 29 day of June, 2001, upon consideration of plaintiff Daniel C. Fanning's ("Fanning") motions for class certification and for a preliminary injunction in 01–cv–1029; defendant the United States of America, *et al.'s* motion to dismiss the Amended Complaint in 01–cv–1029; plaintiff Fanning, *et al.'s* ("Plaintiffs") motion to require distribution of the settlement proceeds in 97–cv–381; the oppositions and responses thereto; and the exhibits and testimony received by the court at a consolidated hearing on the motions held on June 6, 2001, IT IS ORDERED that:

1) Fanning's motion for class certification in 01–cv–1029 is GRANTED. Civil Action No. 01–1029 shall proceed as a class action pursuant to Fed.R.Civ.P. 23(a) and 23(b)(2) for declaratory and injunctive relief under the Administrative Procedures Act, 5 U.S.C. § 702, on behalf of a class consisting of:

All persons who are members of the AcroMed Settlement Class (as defined in Pretrial Order 1117 entered in MDL 1014) and who, as a result of the Class Action Settlement Agreement with AcroMed Corporation, are subject to any Medicare-related claim, brought pursuant to the Medicare Secondary Payer statute, 42 U.S.C. § 1395y, or otherwise, by any of the defendants herein, except nominal defendants Robert E. Welsh, Jr. and PNC Bank, N.A., for reimbursement of the cost of medical care allegedly paid for or provided to them by any such defendant;

2) Plaintiff's Motion for a Preliminary Injunction in 01–cv–1029 is GRANTED;

---

18. In its earlier objection, AcroMed asserted that the Government's claim is subrogatory in nature, and that therefore, pursuant to the settlement, AcroMed is entitled to indemnification from the Settlement Fund for any Government claims against it.

The Government, however, has raised no claim against AcroMed. Further, although the Government's claim may be subrogatory in nature, it is,

nonetheless, independent. It was not extinguished by the Settlement Agreement, to which the Government was not a party. *In re Bone Screw*, 176 F.R.D. at 179 (citations omitted). Thus, the Government's claim is not a "settled claim" under Pretrial Order Number 1117. *Id.;* Settlement Agreement § IV.D.3.b (stating that AcroMed is entitled to indemnification for "settled claims").

3) Defendant the United States of America, *et al.'s* motion to dismiss the Amended Complaint in 01–cv–1029 is GRANTED IN PART and DENIED IN PART;

4) Until further Order of the court, the Federal Defendants[1] are hereby RESTRAINED and ENJOINED from undertaking any action to obtain reimbursement from class members in relation to any money, sums, payments or benefits that class members have received in the past or may receive in the future pursuant to the terms of the AcroMed Settlement Agreement;

5) The Federal Defendants are directed to deposit into the registry of the court any sum that has been paid in the past or which may be paid in the future to any of the Federal Defendants by or on behalf of any class member pursuant to any demand by any Federal Defendant for reimbursement in relation to the AcroMed Settlement. Such deposits shall be made within fifteen (15) days of the date of this Order or within fifteen (15) days of receipt of such payment, whichever is earlier;

6) In lieu of posting security, Robert E. Welsh, Jr., in his capacity as Administrator of the AcroMed Settlement Fund, and PNC Bank, N.A., in its capacity as Trustee for the AcroMed Settlement Agreement are hereby directed to hold the sum of $ 2,500.00 (two thousand five hundred dollars) out of the proceeds of the AcroMed Settlement Fund in escrow pending further Order of the court;

7) The Plaintiffs' Litigation Committee is hereby directed to send a copy of this Order and an explanatory letter to class members;

8) A final hearing on permanent injunctive relief shall be set at a future date;

9) The Federal Defendants' Motion to Stay Proceedings Related to Plaintiff's Motion for Summary Judgment or, in the Alternative, for Enlargement of Time to Respond to Plaintiff's Motion in 01–cv–1029 is DENIED AS MOOT;

---

1. For purposes of this Order, the "Federal Defendants" are: the United States of America ("United States"); the United States Health Care Financing Administration ("HCFA"); the United States Department of Health and Human Services; Tommy G. Thompson, in his capacity as

10) Robert E. Welsh, Jr., in his capacity as Administrator of the AcroMed Settlement Fund, and PNC Bank, N.A., in its capacity as Trustee for the AcroMed Settlement Agreement shall establish and maintain a separate account in the amount of $1,000,000.00 (one million dollars). This reserve may be utilized, pursuant to court order, in the event that the Federal Defendants ultimately establish an interest in Settlement proceeds;

11) The Settlement Administrator and the Settlement Trust shall forthwith commence distribution of the remaining proceeds of Settlement to eligible class members in accordance with this court's Pretrial Orders and the terms of the Settlement Agreement approved by the court in Pretrial Order No. 1117; and

12) To the extent that plaintiff Fanning seeks additional declaratory or injunctive relief, said motions are DENIED WITHOUT PREJUDICE.

SO ORDERED.

Secretary of the United States Department of Health and Human Services; and Thomas Scully, in his capacity as Administrator of HCFA, an Agency of the Department of Health and Human Services.